**FILED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

AO 241 (Rev. 09/17)

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF**
**HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

OCT 17 2022

MITCHELL R. ELFERS
CLERK

**22cv770-KG-JFR**

| United States District Court | District: | |
|---|---|---|
| Name (under which you were convicted): JOE DAVID CHAVEZ JR. | | Docket or Case No.: |
| Place of Confinement : LEA COUNTY CORRECTIONAL FACILITY | Prisoner No.: 78577 | |

| Petitioner (include the name under which you were convicted) | | Respondent (authorized person having custody of petitioner) |
|---|---|---|
| JOE DAVID CHAVEZ JR. | v. | GEORGE STEVENSON |

The Attorney General of the State of: NEW MEXICO

## PETITION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

    TWELFTH JUDICIAL DISTRICT COURT   COUNTY OF OTERO

    1000 NEW YORK AVENUE

    ALAMOGORDO, NEW MEXICO 88310

    (b) Criminal docket or case number (if you know): D-1215-CR-2015-267

2.  (a) Date of the judgment of conviction (if you know): _____

    (b) Date of sentencing: _____

3.  Length of sentence: LIFE PLUS 15 years

4.  In this case, were you convicted on more than one count or of more than one crime?  ☒ Yes   ☐ No

5.  Identify all crimes of which you were convicted and sentenced in this case:  1. First Degree Murder, conspiracy to commit First degree Murder, Arson, Tampering with Evidence

6.  (a) What was your plea? (Check one)

    ☒ (1)   Not guilty          ☐ (3)   Nolo contendere (no contest)

    ☐ (2)   Guilty              ☐ (4)   Insanity plea

AO 241 (Rev. 09/17)

(4) Date of result (if you know): _____

(5) Citation to the case (if you know): _____

(6) Grounds raised: _____

_____

_____

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?    ☐ Yes    ☒ No

    If yes, answer the following:

    (1) Docket or case number (if you know): _____

    (2) Result: _____

    (3) Date of result (if you know): _____

    (4) Citation to the case (if you know): _____

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?    ☒ Yes    ☐ No

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: Twelfth Judicial District Court

    (2) Docket or case number (if you know): D-1215-CR-2012-321 and D-1215-CR-2015-267

    (3) Date of filing (if you know): 1-25-2021

    (4) Nature of the proceeding: Law Offices of the Public Defender (LOPD) Pre-appointment

    (5) Grounds raised: review Rule 5-802 (H)(C). Grounds raised:

See Attached (Grounds Raised)

_____

_____

_____

_____

_____

_____

_____

    (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

    ☐ Yes    ☒ No

    (7) Result: Summarily dismissed

AO 241 (Rev. 09/17)

(8) Date of result (if you know): _5-7-2021_____

(b) If you filed any second petition, application, or motion, give the same information:

    (1) Name of court: _SUPREME COURT OF THE STATE OF NEW MEXICO___

    (2) Docket or case number (if you know): _D-1215-CR-2015-00267/S-1-SC-37067_

    (3) Date of filing (if you know): _____

    (4) Nature of the proceeding: _PETITION FOR WRIT OF CERTIORARY____

    (5) Grounds raised: _See Attached (Grounds Raised)_____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

    ☐ Yes   ☒ No

    (7) Result: _Pending_____

    (8) Date of result (if you know): _____

(c) If you filed any third petition, application, or motion, give the same information:

    (1) Name of court: _____

    (2) Docket or case number (if you know): _____

    (3) Date of filing (if you know): _____

    (4) Nature of the proceeding: _____

    (5) Grounds raised: _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

AO 241 (Rev. 09/17)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

❒ Yes    ❒ No

(7) Result: _____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:    ❒ Yes    ❒ No

(2) Second petition:    ❒ Yes    ❒ No

(3) Third petition:    ❒ Yes    ❒ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

12.    For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

GROUND ONE:    Issues one Through five in Appellants Brief in Chief No. S-1-SC-37067 (Attached). All available state-court remedies have been exhausted.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

All grounds are attached

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground One, explain why: _____

_____

_____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

(c)   **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?   ☒ Yes   ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

    ☒ Yes   ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:   Habeas corpus petition

Name and location of the court where the motion or petition was filed:   Twelfth Judicial District Court

1000 New York avenue Alamogorda, New Mexico 88310

Docket or case number (if you know):   D-1215-CR-2015-267

Date of the court's decision:   5-7-2021

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?   ☐ Yes   ☒ No

(4) Did you appeal from the denial of your motion or petition?   ☒ Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☒ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:   SUPREME COURT OF THE STATE OF

NEW MEXICO

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):   N/A

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

AO 241 (Rev. 09/17)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: _____

_____

_____

**GROUND TWO:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

(c)    **Direct Appeal of Ground Two:**

      (1) If you appealed from the judgment of conviction, did you raise this issue?    ❐ Yes    ❐ No

      (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

      _____

      _____

(d)    **Post-Conviction Proceedings:**

      (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

          ❐ Yes    ❐ No

      (2) If your answer to Question (d)(1) is "Yes," state:

      Type of motion or petition: _____

      Name and location of the court where the motion or petition was filed: _____

      _____

      Docket or case number (if you know): _____

AO 241 (Rev. 09/17)

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?  ❒ Yes  ❒ No

(4) Did you appeal from the denial of your motion or petition?  ❒ Yes  ❒ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  ❒ Yes  ❒ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Two : _____

_____

_____

_____

**GROUND THREE:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

GROUND 6  Whether the state violated the Double Jeopardy prohibition under successive prosecutions by using the same events and evidence that was used to prove: Murder, conspiracy to commit murder, Arson, and Tampering with evidence in the instant case

(a) Supporting facts are attached.

(b) If you did not exhaust your state remedies on Ground 6, explain why. When petitioner filed the state habeas on this issue he presented it as a Double Jeopardy issue under collateral estoppel, but Through Due Diligence later learned that it a successive prosecution instead They are the same facts. (The state used the facts from The entire racketeering Trial to prove everything in the murder Trial. other than that remedies are exhausted

© Direct Appeal GROUND 6

(1) This issue was not raised on Direct appeal.

(2) because my attorney raised it in a different way only challenging the admission under 404(B) and whether it was prejudicial or not. Petitioner raised it in the state habeas as a successive prosecution in violation of Double Jeopardy

(d) Post-conviction proceedings:

1. Did you raise this issue through a post conviction motion

or petition for habeas corpus in a state Trial court?   yes

2) answer was yes state: New Mexico , in a habeas corpus petition

Name and Location of the court where the motion or petition was filed

Twelfth Judicial District Court ,  Cause No. D. 1215-CR-2015-267

Date of the courts decision: do not remember, but it was denied

and I do not have a copy of the order

(3) Did you receive a hearing on your motion or petition?      no

(4) Did you appeal from the denial of your motion or petition?    yes

(5) If your answer to question (d)(4) is "Yes", did you raise this issue in the appeal?

yes   (6) If your answer to question (d)(4) is "Yes", state: New Mexico

Name and location of the court where the appeal was filed : SUPREME

COURT OF THE STATE OF NEW MEXICO


Docket or case number : S-1-SC-37067

Date of the courts decision: 1-16-2020

Result : Denied

(7) Answer to (d)(4) and (d)(5) was "yes"

(e) No other remedies have been used to exhaust state remedies

on GROUND:6 exept state habeas corpus petition

Docket or case number

GROUND 7: whether the State violated the Double Jeopardy prohibition under State v. Nunez, and New Mexico Forfeiture Act HB-560, by Arbitrarily seizing petitioners property Through State and Federal forfeiture proceedings which petitioner did not attend, Then obtaining criminal convictions through a criminal Trial two years later in which petitioner received 48 years in prison, using same evidence and events in Two separate proceedings.

(a) Supporting Facts: They are attached

(b).

(c) Direct Appeal GROUND: 7

(1) This issue was not raised on direct appeal

(2)

(d) Post-Conviction Proceedings:

(1) Did you raise This issue Through a post-conviction motion or petition for habeas corpus in a state Trial court? yes

(2) If your answer To question (d)(1) is "Yes", state: New Mexico

Type of motion or petition: habeas corpus petition

Name and location of the court where the motion or petition was filed: Twelfth Judicial District Court, 1000 New York avenue Alamogordo, New Mexico

Docket or case number: cause No. D-1215-CR-2015-267

Date of the courts decision

Result: Denied

(3) Did you receive a hearing on your motion or petition? ___ NO

(4) Did you appeal from the denial of your motion or petition ___ yes

(5) If your answer to question (d)(4) is "Yes", did you raise this issue in the appeal? ___ yes

(6) If your answer to question (d)(4) is "Yes", state: New Mexico

Name and location of the court where the appeal was filed: SUPREME

COURT OF THE STATE OF NEW MEXICO

Docket or case number: S-SC-37067

Date of the courts decision: 1-16-2020

Result: Denied

(7) Answer to (d)(4) and (d)(5) was "Yes"

(e) No other remedies have been used to exhaust state remedies on

GROUND 7 exept state habeas corpus petition.

GROUND 8: RACKETEERING CASE CAUSE NO. D-1215-CR-2012-321.

The state failed to prove, beyond a reasonable doubt that petitioner committed at least two crimes that constitute racketeering, also failing to prove a pattern of racketeering, money laundering, and the existense of an enterprise.

(a) Supporting facts: Are Attached

(b) state remedies are exhausted.

(c) Direct Appeal of GROUND 8?

(1) If you appealed from the judgment of conviction, did you raise this issue? No

(2) If you did not raise this issue in your direct appeal, explain why: Attorney George Harrison refused to listen to petitioner. And refused to raise it in Trial and post-conviction

(d) Post-Conviction Proceedings:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state Trial court? yes

(2) If your answer to Question (d)(1) is "Yes", state: New Mexico

Type of motion or petition: Habeas corpus petition

Name and location of the court where the motion or petition was filed: Twelfth Judicial District Court, 1000 New York avenue Alamogordo, New Mexico 88310

Docket or case number: Cause No. D-1215-CR-2015-267

Date of the courts decision

Result: Denied

(3) Did you receive a hearing on your motion or petition?     NO

(4) Did you appeal from the denial of your motion or petition     yes

(5) If your answer to Question (d)(4) is "Yes", did you raise this issue in the appeal?   yes

(6) If your answer to Question (d)(4) is "Yes", state: New Mexico Name and location of the court where the appeal was filed:

SUPREME COURT OF THE STATE OF NEW MEXICO

Docket or case number: S-SC-37067

Date of the courts decision: 1-16-2020

Result: Denied

(7) Answer to (d)(4) and (d)(5) was "Yes".

(e) No Other remedies have been used to exhaust state remedies on GROUND 8: exept state habeas corpus petition.

GROUND 9: LEGALY FLAWED JURY INSTRUCTIONS, As To count 1: racketeering, and count 2: conspiracy To commiT racketeering, in cause No. D-1215-CR-2012-321, in conjunction with GROUND 8: above and consistent with State v. Angela Cott.

(a) supporting facts: Are Attached.

(b) State remedies are exhausted.

(c) Direct Appeal of GROUND 8:

(1) If you appealed from The JudgemenT of conviction, did you raise This issue? NO

(2) If you did not raise This issue in your direcT appeal explain why: Attorney George Harrison refused to listen to petitioner about These issues and refused To raise Them in Trial and post-conviction GROUNDS 8 and GROUND 9:

(d) PosT-Conviction Proceedings:

(1) Did you raise This issue Through a post-conviction motion or petition for habeas corpus a state Trial court? Yes

(2) If your answer To Question (d)(1) is "Yes" state: New Mexico

Type of motion or petition: Habeas corpus petition.

Name and location of The court where The motion or petition was filed: Twelfth Judicial District Court, 1000 New York avenue Alamogordo New Mexico

Docket or Case number: Cause No. D-1215-CR-2015-267

Date of court's decision

Result: Denied

(3) Did you receive a hearing on your motion or petition? NO

(4) Did you appeal from The denial of your motion or petition? Yes

(5) If your answer To Question (d) (4) is "Yes", did you raise This issue in The appeal? Yes

(6) If your answer To Question (d)(4) is "Yes", state New Mexico Name and location of the court where The appeal was filed:

  SUPREME COURT OF THE STATE OF NEW MEXICO


Docket or case number: S-sc-37067

Date of The courts decision: 1-16-2020

Result: Denied

(7) Answer To (d)(4) and (d)(5) was "Yes"

(e) No other remedies have been used To exhaust state remedies on

  GROUND 8: exept state habeas corpus petition.

GROUND 10: PROSECUTOR PROSECUTED PETITIONER, THEN THREAT-ENED, AND PROSECUTED THIRD PARTY FAMILY MEMBERS TO COERCE TESTIMONY AGAINST PETITIONER IN THE ABSENSE OF PROBABLE CAUSE IN THE PRESENT CASE. Prosecutor Kishy Wills charged petitioner with one count of money laundering, Then Threatened and prosecuted Two Third party family members: Sister Maria Chavez and girlfriend and mother of Petitioners children Tracy Garrison. Maria Chavez was charged with racketeering and conspiracy To racketeer for allegedly laundering The proceeds of peti-tioners alleged illegal activity Through The mortgage of her home 2815 Birdie Loop Alamogardo, New Mexico

(a) supporting facts: Attached.

(b) State remedies are exhausted.

(c) Direct Appeal of GROUND:10:

(1) If you appealed from the Judgment of conviction did you raise This issue? NO

(2) If you did not raise This issue in your direct appeal explain why: Attorney George Harrison refused To listen To petitioner about These issues and refused To raise Them in Trial and post-conviction

(d) Post-Conviction Proceedings:

(1) Did you raise This issue Through a post-conviction motion or petition for habeas corpus in a state Trial court? Yes

(2) If your answer To Question (d)(1) is "Yes" state: New Mexico.

Type of motion or petition? : Habeas corpus petition

Name and location of the court where The motion or petition was filed:

Twelfth Judicial District Court 1000 New York avenue Alamogordo New

Mexico 88310

Docket or case number: cause No D-1215-CR-2015-267

Date of courts decision

Result: Denied

(3) Did you receive a hearing on your motion or petition? NO

(4) Did you appeal from The denial of your motion or petition? Yes

(5) If your answer To Question (d)(4) is "Yes", did you raise This issue

in The appeal? Yes

(6) If your answer to Question (d)(4) is "Yes", State: New Mexico

Name and location of The court where The appeal was filed:

SUPREME COURT OF THE STATE OF NEW MEXICO


Docket or case number: S-SC-37067

Date of The Courts decision: 1-16-2020

Result: Denied

(7) Answer To (d)(4) and (d)(5) was "Yes".

(8) No other remedies have been used to exhaust state remedies on

GROUND 10: exept state habeas corpus petition.

AO 241 (Rev. 09/17)

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

(c)     **Direct Appeal of Ground Three:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?    ❐ Yes    ❐ No

    (2) If you did not raise this issue in your direct appeal, explain why: _____

    _____

    _____

(d)     **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

             ❐ Yes    ❐ No

    (2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition: _____

    Name and location of the court where the motion or petition was filed: _____

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

    _____

    (3) Did you receive a hearing on your motion or petition?        ❐ Yes    ❐ No

    (4) Did you appeal from the denial of your motion or petition?     ❐ Yes    ❐ No

    (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ❐ Yes    ❐ No

    (6) If your answer to Question (d)(4) is "Yes," state:

    Name and location of the court where the appeal was filed: _____

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

    _____

    _____

    _____

AO 241 (Rev. 09/17)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Three: _____

_____

_____

**GROUND FOUR:** _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

(c)    **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☐  Yes    ☐  No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐  Yes    ☐  No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

AO 241 (Rev. 09/17)

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?                                    ❏  Yes        ❏  No

(4) Did you appeal from the denial of your motion or petition?                            ❏  Yes        ❏  No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ❏  Yes        ❏  No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four:

AO 241 (Rev. 09/17)

13.    Please answer these additional questions about the petition you are filing:

(a)    Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?    ☒ Yes    ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: _____

_____

_____

_____

(b)    Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

_____

_____

_____

14.    Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?    ☐ Yes    ☒ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available. _____

_____

_____

_____

_____

_____

_____

_____

15.    Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?    ☐ Yes    ☒ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

16.    Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:    George Harrison

(b) At arraignment and plea:    George Harrison

(c) At trial:    George Harrison

(d) At sentencing:    George Harrison

(e) On appeal:    Jefferey Buckels

(f) In any post-conviction proceeding:    no

(g) On appeal from any ruling against you in a post-conviction proceeding:    No

17.    Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?    ☐ Yes    ☒ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?    ☐ Yes    ☐ No

18.    TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

AO 241 (Rev. 09/17)

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

    (1)    A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of -

        (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

        (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

        (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

        (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

AO 241 (Rev. 09/17)

    (2)     The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:   Petitioner Joe Chavez respectfully requests that This court reverse his convictions for Murder and conspiracy and remand this case To The district court for a new Trial or Alternatively Dismiss These charges with prejudice.

or any other relief to which petitioner may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for

Writ of Habeas Corpus was placed in the prison mailing system on   _10- 6 - 2022_   (month, date, year).

Executed (signed) on   _10-6-2022_   (date).

_____
Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

_____

_____

_____

_____

GROUNDS RAISED : GROUND 1 : All grounds and previous arguments as set fourth in the Brief in Chief. GROUND 1 : whether the Trial Court erred in admitting "Uncharged Misconduct Evidence". GROUND 2 : Whether the Trial Court erred in permitting Jude Sanchez to testify due to the States Failure to establish Loza's unavailabilty GROUND 3 : Whether the Trial Court erred in permitting petitioners girlfreind to testify that petitioner was a Wife Beater. GROUND 4 : Whether the prosecution made critical, misleading representations prior to Trial concerning the nature of the "Loza Recordings". GROUND 5 : Whether cumulative error warrants a new Trial. GROUND 6 : Whether the state violated the Double Jeapardy prohibition under Successive Prosecutions by using the same evidence and events that was used to prove : Drug Trafficking, racketeering, money laundering, and associated conspiracies from prior Trial cause No. D-1215-CR-2012-321 ; to prove : Murder, conspiracy to commit murder, Arson, and Tampering with evidence in The instant case. GROUND 7 : Whether the State violated Double Jeopardy Prohibition under State v. Nunez and New Mexico forfeiture act HB-560, by Arbitrarily seizing petitioners property through State and Federal forfeiture proceedings which petitioner did not attend, Then obtaining criminal convictions through a criminal trial two years later in which petitioner recieved 48 years in prison, using same evidence and events in two separate proceedings.

GROUND 8: RACKETEERING CASE CAUSE NO. D-1215-CR-2012-321. The State failed to prove, beyond a reasonable doubt that petitioner committed at least two crimes that constitute racketeering, also failing to prove a pattern of racketeering, money laundering, and the existense of an enterprise.

GROUND 9: LEGALLY FLAWED JURY INSTRUCTIONS. As to counts 1: racketeering, and count 2: conspiracy to commit racketeering in cause No. D-1215-CR-2012-321, in conjunction with GROUND 8: above and consistent with State v. Angela Catt.

GROUND 10: PROSECUTOR PROSECUTED PETITIONER, THEN THREATENED AND PROSECUTED THIRD PARTY FAMILY MEMBERS TO COERCE TESTIMONY AGAINST PETITIONER IN THE ABSENSE OF PROBABLE CAUSE. IN THE PRESENT CASE. Prosecutor Kirby Wills charged petitioner with one count of money laundering, then threatened and prosecuted two third party family members: Sister Maria Chavez and girlfreind and mother of petitioners children Tracy Garrison. Maria Chavez was charged with racketeering and conspiracy to racketeer (she did not commit the two required predicate offenses) for allegedly laundering the proceeds of petitioners alleged illegal activity (the trafficking of controled substances) through the mortgage of her home 2815 Birdie Loop Alamogordo, New Mexico.

Petitioner Joe Chavez stands by all of the issues, and pevious arguments as set fourth in the brief in chief, and appellant s reply brief filed April 2, 2018. Also presenting additional issues discovered through Due Diligence, (issues 6-10 of the Habeas corpus petition). Petitioner initially presented issue #6 as a Double Jeopardy - Collateral Estoppel issue in the state habeas petition and later discovered through Due Diligence that it is a successive prosecution and Due Process violation.

Ground 6. Petitioner presents a Double Jeopardy and Due Process violation to This court, in conjunction with ground 1. in appellants brief in chief.
This issue is not only about whether The Trial court erred in deciding whether to admit The extensive uncharged misconduct evidence under Rule 404 (B) and after The state failed to meet evidentiary prerequisites set fourth by The Judge, in order to make it admissible, regardless The Trial court decided to admit it anyway. It now becomes a Double Jeopardy and Due Process violation under Successive Prosecutions for The following reasons:

1. It was The second instance in which petitioner was placed in jeopardy of "life or limb." The same evidence That was

used to prove: Drug Trafficking, racketeering, money laundering, and associated conspiracies in (Cause No. 1215-CR-2012-321), was used to prove 1st Degree Murder, Conspiracy to commit 1st Degree Murder, Tampering with evidence, and Arson in the present case (Cause NO. 1215-CR-2015-267).

2. Jeopardy attached in both Trials when the jury was empaneled and sworn "Crist v. Bretz, 437 U.S. 28 (1978).

3. Same offense, same evidence was used in both Trials

4. Petitioner was prosecuted by the Otero County DA's office in both Trials. "Same Soveregn".

5. In the first Trial (Cause NO. 1215-CR-2012-321). The state failed to prove beyond a reasonable doubt, that petitioner committed at least two crimes that constitute racketeering simultaneously failing to prove, a pattern of racketeer-ing", and "the existense of an enterprise". as required by both State and Federal racketeering statutes. The predicate acts, which were Trafficking methamphetamine by possession with intent to distribu-te, and possession of marijuana, both resulted in acquittals, In addition to this, the jury instructions were filawed as to counts 1. racketeering and count 2: Conspiracy to commit racketeering. Denying petitioners Due Process rights.

GROUND 7: Whether The State violated Double Jeopardy and Due Process under State v. Nunez and the New Mexico Forfeiture Act HB-560 By Arbitrarily seizing petitioners property, Holding a State forfeiture proceeding, (cause No. D-1215-CR-2012-321), Then Transfering The Forfeiture To The Federal Government, The Federal Government Then Holding a Federal Forfeiture Proceeding, (CIV. NO. 13455 WPL /LAM). Petitioner did not attend The Federal Forfeiture Proceeding, The Federal Government Then filed a Default Judgement attaching jeopardy. Two years later, The State Obtained criminal convictions for The same charges using The same evidence Through a criminal Trial. Petitioner recieved 48 years in prison Taking a second bite of The apple.

## FACTS

1. Whether The State and Federal forfeiture was arbitrary and punitive in nature. First, The State had no evidence, That petitioner made multiple controled sales of methamphetam- ine Through a confidential reliable informant (C.I.) Second, Petitioner Joe Chavez was never in possession of four pounds of methamphetamine. Third, The property seized was not involved in any illegal activity.

Fourth, The value of The property seized exeeded the Fine for The crimes petitioner was accused of, which were : 1. Trafficking methamphetamine by possession with intent to distibute.

5

2. Possession of marijuana with intent to distribute. Petitioner was later acquitted of those charges through the criminal trial

2. The State held a forfeiture proceeding prior to and separate from, the criminal trial, then transfered the property to the Federal Government. circumventing State Double Jeopardy, and asset/forfeiture protections and (Denying Due Process). New Mexico Forfeiture Act HB-560 which requires a criminal conviction before property can be subject to forfeiture.

3. Petitioner did not attend the federal forfeiture proceeding, The Federal Government then filed default judgement jeopardy attached.

4. Two years later the State initiated a criminal trial and obtained criminal convictions using the same evidence that was used in both State and Federal forfeiture proceedings. As a result of the criminal trial petitioner recieved 48 years in prison. Taking a second bite of the apple.

GROUND 8 :

THE RACKETEERING CASE CAUSE NO. D-1215-CR-2012-321

The manner in which The New Mexico state racketeering statute is being applied to petitioner is Arbitrary, Fundamentaly Unfair, Discriminatory, and Denies Procedural Due Process of Law; To be convicted under section 30-42-4 (A), The defendant (s) must have committed at least two punishable offenses That constitute racketeering. (citing § 30-42-3 (D))); State v. Crews, 1989-NMCA-088, ¶ 47, 110 N.M. 723, 799 P. 2d 592. To establish a pattern of racketeering, The State must prove Two incidents of racketeering, Often refered to as predicate offenses or predicate acts, section 30-42-3 (D); cf. State v. Clifford, 1994-NMSC-048, ¶ 19, 117 N.M. 508, 873 P. 2d 254. In This case The State failed to prove beyond a reasonable doubt, That Petitioner Joe Chavez committed at least two crimes That constitute racketeering. Petitioner was found to be not guilty of the only two possible predicate offenses that could possibly constitute racketeering. The Arbitrary enforcement of the New Mexico state racketeering statute is fundamentaly unfair and disregards requirements of Procedural Due Process of law guarantied to petitioner by both New Mexico and U.S. Constitutions.                GROUND 9 :

THE JURY INSTRUCTIONS ARE FLAWED AS TO COUNTS : ONE AND TWO OF THE RACKETEERING CASE CAUSE NO. D-1215-CR-2012-321 FOR THE FOLLOWING REASONS -   FACTS

As to count 1 : Racketeering - The jury instruction defining

7.

racketeering included all of the possible predicate offenses, but failed to provide the elements of those crimes — Although the jury was given an instruction that listed twenty-five different predicate offenses, the jury was instructed on the essential elements of only two possible predicate offenses — Trafficking in controled substances, and conspiracy to traffick in controled substances. As to count 2 : Conspiracy to commit racketeering — This instruction tracks the uniform jury instruction for conspiracy, inserting "racketeering" as the named felony that was the subject of the conspiracy although the intention of the conspiracy to commit racketeering instruction may have been to incorporate all of the elements from the racketeering instruction pertaining to count 1: It did not accomplish this. Instead, the jury instruction referes to racketeering" alone. Although "racketeering" is a separate criminal offense (as charged in count 1), It also is a defined term meaning any act involving any of twenty-five predicate offenses. It is not clear from the instruction in count: 2 Whether "racketeering" referes to the separate criminal offense or to the defined term. If it is the latter, the instruction for count 2 (conspiracy to commit racketeering) requires only that petitioner and another agreed to and intended to commit any one of the twenty-five predicate acts. This leads to the possibility that, for example, if the jury determined that petitioner committed one count of conspiracy to commit drug Trafficking, the jury also

8.

could have convicted petitioner for conspiracy to commit racketeering
on this basis alone. This is impermissible. The instruction omitted
among other things, any elements pertaining to an enterprise or a
pattern of racketeering.

GROUND 10 : PROSECUTOR PROSECUTED PETITIONER, THEN THREATENED AND
PROSECUTED THIRD PARTY FAMILY MEMBERS TO COERCE TESTIMONY
AGAINST PETITIONER IN THE ABSENCE OF PROBABLE CAUSE IN THE PRESENT
CASE. Prosecutor Kirby wills charged petitioner with one count of money
laundering, then threatened and prosecuted two third party family
members : Sister Maria Chavez and girlfriend and mother of petitioners
children Tracy Garrison. Maria Chavez was charged with racketeerin
g and conspiracy to racketeer (she did not commit the two required
predicate offenses) for allegedly laundering the proceeds of petitioners
alleged illegal activity (the trafficking of controled substances) through
the mortgage of her home 2815 Birdie Loop Alamogordo, New Mexico.
When Maria Chavez was testifying in her Brother Robert Chavez
behalf in his racketeering Trial cause No. D-1215-CR-2012-323 she
took documents to prove how the home was purchased, the Bank
accounts that were used, her credit, where the proceeds came from
to prove that their allegations were false, when she tried to present the
documents prosecutor Kirby wills objected and Mart Sanchez sustained
his objection Judge Mack t. Sanchez did not allow her to show the
documents to the jury (these documents are still available if you would

9.

like to see them). Prosecutor Kirby Wills charged Tracy Garrison (the mother of petitioners & young girls) with racketeering, conspiracy to racketeer, and money laundering. (She did not commit any crimes that constitute racketeering) because she allegedly purchased vehicles and placed them in her name with proceeds derived from petitioners alleged illegal activity (namely the trafficking of methamphetamine) in the absence of probable cause. False statements were included and relied upon for the finding of probable cause in the warrant affidavit to arrest, search, and seize petitioner Joe Chavez, his home, his property, and third party family members. Petitioner respectfully requests a Franks hearing under Franks v. Delaware - 438 U.S. 154 (1978). To determine whether probable cause existed to arrest, search, and seize petitioner, his property, and prosecute third party family members for racketeering, conspiracy to racketeer, 13 counts of money laundering, and associated conspiracies. Petitioner will point out specifically with supporting reasons the portion of the warrant affidavit claimed to be false, accompanied by offers of proof including affidavits and sworn reliable statements of witnesses as required by Franks v Delaware 438 U.S. 171.

The affidavit for arrest warrant labled EXHIBIT "A" contains five false statements that were relied upon for the finding of probable cause

Petitioner has attached a report containing interviews conducted by Matthew Ortiz of Preston Eldridge, Author of the search warrant affidavit and Agent

10.

using the false statement to find probable cause, to arrest, search, and seize, petitioner and his property. The report is labeled "In the matter of" An investigation against Joe and BOB Chavez interview of Preston Eldridge September 4.

Petitioner has high-lighted:

In-orange, pages 8, 9, 10 interview of Preston Eldridge the alleged controlled purchases of methamphetamine.

In-light blue pages 12., 13c., 17o, 18o, Preston Eldridge has no knowledge of illegal activity by Tracy Garrison or Joe Chavez.

In-pink pages 8., 18., Preston Eldridge showing his lack of knowledge and experience about elements of money laundering and racketeering

In Yellow pages 6., 7., depicts (O.C.N.E.U.) Agents entering petitioner home illegally - based on false information and an extremely broad warrant None of them having knowledge and experience in money laundering and racketeering, seizing assets claiming them to be evidence of money laundering.

False statement #4. of the arrest warrant affidavit - Affiant has conducted multiple contoled purchases of methamphetamines with the assistance of a confidential reliable informant to whom the above named defendant delivered methamphetamines. These narcotics were paid for by monies given to the informant by affiant.

Second False Statement #8. of the arrest warrant affidavit

11.

\#

8. Affiant is aware That the above named defendant (has purchased numerous vehicles from Richardson Motor Company. Located at 318 South white Sands Blvd. Alamogorda, New Mexico with the proceeds of his drug Trafficking activities). As part of This drug Trafficking enterprise, The above named defendant has consistently operated in concert with Robert Chavez, who as part of The same drug trafficking enterprise and its ongoing operations was arrested with approximately four pounds of methamphetamines on May 1st, 2012.

Numbers #10. #11. and #12. all repeat The same statement, (That petitioner purchased vehicles with The proceeds of a specified illegal activity).

1. First of all This arrest warrant affidavit does not contain a statement as To what makes the confidential reliable informant reliable, veracity or basis of Knowledge.

2. Statement #4. Is vague, iT does not contain enough detailed information describing The events That allegedly took place, the Time, location, Date, Did he purchase The drugs? and if he did how much he paid for Them, what was the amount of The drugs, how much The drugs weighed, did he conduct a field Test To determine whether The substance was in fact methamphetamine, was iT placed into an evidence bag and sealed placed in evidence where he got the funds from, did he use video/audio recordings, was iT all logged into his logbooks?

12

12

3. Attached is a report Labled "In the matter of" An investigation against JOE and BOB Chavez interview of Preston Eldridge September 4. It was done in 2012 by Matthew Ortiz on page 32 of page 8. 16 Affiant Preston Eldridge was asked "on how many occasions did he purchase controled substances from petitioner Joe Chavez" Preston Eldridge answers "a couple" and the amounts he allegedly purchased were recreational "a gram or two at a time" he had no idea what moneys he used but it was all logged into his log books, and they keep a receipt book To show where all The money was spent. He used These moneys with his unnamed informant to make purchases of controled substances with petitioner. He did not observe any Transaction between The informant and Joe Chavez page 35 of page 9 (63, 14,) Affiant claims phone calls were made and recorded between informant and Joe Chavez. page 36 of page 9, (4-19)

4. In Total under cross (by Attorney Matthew Ortiz), When Mr Ortiz asked affiant Preston Eldridge "So you made multiple controled purchases of methamphetamines from my client Joe Chavez with the assistance of a confidential reliable informant"? Preston Eldridge answered well I have one. Mr. Ortiz then asked him how much methamphetamine did you purchase from my client Joe Chavez? Preston Eldridge answered I don't know, I don't remember, a gram or gram and a half, Ortiz asked him do you have it here today? Preston Eldridge Answers no my evidence custodian is responsible for having all that here Today. Matthew Ortiz asked him do you have The recordings

13

of alleged conversations between informant and Joe Chavez, No, no receipt book to show he spent money on the methamphetamine, No methamphetamine, did not know or remember the amount of methamphetamine or if he weighed it or field tested it or if he put it into an evidence bag, No log books where Preston Eldridge claimed to have everything logged into, No detailed information describing the events that took place, and no information. In addition to this Judge Mark T. Sanchez allowed the state (Kirby Wills) to violate all deadlines for discovery. Attorney Matthew Ortiz put motions for discovery over and over since he was hired specifically on these alleged multiple controled purchases of methamphetamine we never got discovery on them the states excuse? "Its not ready yet but we're working on it,"

   5. STATEMENT #8. OF EXHIBIT "A"

   The first part of #8. in the arrest warrant affidavit is a false statement and is not clear as to which unlawful activity he is refering to. That was used to purchase the vehicles from Richardson Motor Company but either one is a false statement, if he is refering to the multiple controled purchases of methamphetamine? Preston Eldridge failed to prove they happened. If he's refering to the four pounds of methamphetamine that Robert Chavez was arrested with? Evidence proved petitioner was never in possession of the four pounds of methamphetamine. Petitioner was charged

14.

Through Grand Jury indictment of being in possession of the four pounds of methamphetamine. And later acquitted. The four pounds of methamphetamine were seized by Preston Eldridge and the (O.C.N.E.U.) No proceeds were derived from There. Other than the illegal activity mentioned here, There's no other source of illegally obtained money. This makes statement #8. of EXHIBIT "A" a false statement, and is the same false statement used in #10., #11., #12. (Petitioner used proceeds of an unlawful activity to purchase vehicles). and was also relied upon for the finding of probable cause. Preston Eldridge failing to prove multiple controled purchases of methamphetamine and both acquittals are on court record

IN THE SEARCH WARRANT AFFIDAVIT FOR 2815 BIRDIE LOOP LABELED EXHIBIT "A" Affiant does not show how The "documents" They are searching for are connected to the four pounds of methamphetamine Robert Chavez was arrested for on May 1st 2012, or any other criminal activity and why They believe They are in petitioners home. The main subject of the search warrant is The four pounds of methamphetamine Robert Chavez was arrested for on May 1st, 2012.
Affiant does not show evidence of how Joe Chavez and Tracy Garrison are Robert Chavez' co-conspirators other than him writting it down and merely mentioning That he is aware Through previous investigations

15.

There is no nexus between the items sought in the warrant and the four pounds of methamphetamine Robert Chavez was arrested for on May 1st, 2012 for the following reasons:

1. Evidence proves beyond a reasonable doubt that the four pounds of methamphetamine came from Phoenix, Arizona, and were never in contact with Joe Chavez or Tracy Garrison

2. The four pounds of methamphetamine were seized by O.C.N.E.U. agents at 780 Cholla Alamogordo, New Mexico. Therefore proceeds were not derived, or used in any way by Joe Chavez or Tracy Garrison from the four pounds of meth.

3. All of the vehicles that were seized were not connected or involved in any illegal activity, and were not legally subject to forfeiture. Reports written by OCNEU agents show that these vehicles did not go to Arizona.

Without the four pounds of methamphetamines Robert Chavez was arrested for on May 1st, 2012. And without the false statement used by lead O.C.N.E.U. agent Preston Eldridge (the multiple contoled purchases of methamphetamine) (that he also failed to prove), 6 vehicle titles with Tracy Garrison's name on them is no reason to search for documents related to racketeering, money laundering and conspiracy inside petitioners home. Illegal activity and probable cause did not exist.

161

24

Magistrate Court Criminal Rule 9-213

## STATE OF NEW MEXICO

IN THE DISTRICT COURT

_____OTERO_____ COUNTY

STATE OF NEW MEXICO

v.

████████████

**DOB: 10/02/69**          Defendants(s)
**SOC: 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**

Number

## SEARCH WARRANT

THE STATE OF NEW MEXICO TO ANY OFFICER AUTHORIZED TO EXECUTE THIS WARRANT:

Proof by Affidavit for Search Warrant, having been submitted to me, I am satisfied that there is probable cause that the person named or property described in the Affidavit is located where alleged in the Affidavit and I find the grounds exist for the issuance of the Search Warrant. A copy of the Affidavit is attached and made a part of this Warrant.

YOU ARE HEREBY COMMANDED to search forthwith the person or place described in the Affidavit between the hours of 6:00 a.m. and 10:00 p.m., unless I have specifically authorized a nighttime search, for the person or property described in the Affidavit, serving this Warrant together with a copy of the Affidavit, and making the search and if the person or property be found there, to seize the person or the property and hold the property and hold for safekeeping until further order of the Court.

You are further directed to prepare a written inventory of any person or property seized. You are further directed to file the return and written inventory with the Court promptly after its execution.



Date

I was already in custody on This date
doesn't it have to be signed before arrest?

Judge

## AUTHORIZATION FOR NIGHTTIME SEARCH

I further find that reasonable cause has been shown for nighttime execution of this Warrant. I authorize execution of this

Warrant at any time of the day or night for the following reasons: _____

_____

(set forth reasons why a nighttime search is necessary)

_____ **Judge**

White - Court Copy                    Yellow - Defendant's Copy                    Pink - Service Copy

Approved: Supreme Court, October 1, 1974, amended October 1, 1976 and July 1, 1980.
Criminal Form 2.50 - (1 of 2)

FP

25

Magistrate Court Criminal Rule 9-213

STATE OF NEW MEXICO

IN THE DISTRICT COURT

_____OTERO_____   COUNTY

STATE OF NEW MEXICO

v.

~~Joe Chavez~~ _____   Number _____

**DOB: 10/02/69**                    Defendant(s)
**SOC: 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**

### AFFIDAVIT FOR SEARCH WARRANT

Affiant, being duly sworn, upon his oath, states that I have reason to believe that on the following described premises or person  of  (here name person and/or described premises)

### SEE EXHIBIT "A"

in the city or county designated above there is now being concealed (set forth name of person or described property as particularly as possible)

### SEE EXHIBIT "A"

and that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows: (include facts in support of the credibility of any hearsay relied upon; if necessary, continue on reverse side of this form or on a separate page or pages)

### SEE EXHIBIT "A"

Subscribed and sworn to or declared and affirmed
to before me in the above named county of the
State of New Mexico this ~~Fifth~~
~~May~~ ____, 20 12 .

_____        _____
Judge, Notary or Other Officer                         Signature of Affiant
Authorized to Administer Oaths

District Judge                                                    Detective
_____        _____
Official Title                                                    Official Title (if any)

NOTE: This affidavit shall be filed in the same file as the search warrant.  If no criminal proceedings are filed, the affidavit and warrant shall be filed in a miscellaneous file.

White - Goes with Search Warrant; return to Court        Yellow - Defendant's copy        Pink - Court copy

Approved: Supreme Court, July 1, 1980.
   Criminal Form 9-213



AFFIDAVIT FOR ARREST WARRANT                MAGISTRATE COURT
STATE OF NEW MEXICO                             OTERO COUNTY
   VS

**Joe Chavez**, Defendant
  **DOB: 10-2-69   SOC: 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**

## EXHIBIT "A"
### PAGE 1 OF 2

The above named defendant has been arrested without a warrant for the following reasons (set forth a plain, concise and definitive statement of facts establishing probable cause):

1. Affiant is a full time salaried Police Officer employed by the Otero County Sheriff's Office and is currently assigned to the Otero County Narcotics Unit as an agent. Affiant has been a certified police officer in the State of New Mexico for the past 6 years.

2. Affiant and members of the Otero County Narcotics Enforcement Unit are conducting an investigation concerning the above named defendant and his involvement in the trafficking of controlled substances and money laundering in and around the Otero County area.

Affiant is aware through numerous and previous narcotics investigations that the above named defendant is involved in the trafficking of controlled substances in and around the Otero County area.

Affiant has conducted multiple controlled purchases of methamphetamines with the assistance of a confidential reliable informant to whom the above named defendant delivered methamphetamines. These narcotics were paid for by monies given to the informant by the Affiant.

Affiant is aware that the above named defendant resides at ████████ Alamogordo, Otero County, New Mexico, that the above named defendant is a resident of New Mexico, and currently has a New Mexico Drivers License, number 505685458.

Affiant is aware through searches conducted by Special Agent Kelly Mercer of New Mexico Department of Taxation and Revenue through the databases of New Mexico Workforce Solutions that the above named defendant has never been lawfully employed in the State of New Mexico and therefore has no reportable income.

Affiant is aware through searches conducted by Special Agent Kelly Mercer of New Mexico Department of Taxation and Revenue through the databases of New Mexico Workforce Solutions that the above named defendants co-conspirator, Tracy Garrison has not been lawfully employed in the State of New Mexico since 2008 and therefore has no reportable income since that time.

Affiant is aware that the above named defendant has purchased numerous vehicles from Richardson Motor Company, located at 318 South White Sands Blvd, Alamogordo, New Mexico with the proceeds of his drug trafficking activities. As part of this drug trafficking enterprise the above named defendant has consistently operated in concert with Robert Chavez, who as part of the same drug trafficking enterprise and its ongoing operations, was arrested with approximately 4 pounds of methamphetamines on May 1, 2012.

Affiant is aware during the pendency of this ongoing investigation that on May 2, 2012, Commander Neil LaSalle entered into a consensual conversation with the above named defendant and during that conversation



Page 2

32

the above named defendant admitted that all vehicles purchased through Richardson Motor Company by Tracy Garrison were purchased with his (the above named defendant's) money. The above named defendant further stated that Ms. Garrison had "nothing to do with it."

Affiant is aware that beginning on or about ████████ and continuing until on or about ████████ the above named defendant and Ms. Garrison, acting in concert with the above named defendant, used the proceeds of the above named defendant's drug trafficking enterprise to purchase the following vehicles:

A. On 03-11-10, a 2006 Buick Lacrosse CX, VIN: 2G4WC582061182473, for the total price of $13,579.45.
B. On 01-03-11, a 2011 Dodge Charger RT, VIN: 2B3CL5CT9BH506062, for the total price of $30,600.00 of which $15,000.00 was paid in cash.
C. On 02-15-12, a 2010, Dodge Charger SXT, VIN: 2B3CA3CV8AH192060, for the total price of $20,469.45 of which $9,974.45 was paid in cash.
D. On 03-14-11, a 2004 Mazda Tribute LX, VIN: 4F2Y704114KM12899, for the total price of $4,309.45.
E. On 06-25-11, a 2010 Chevrolet Camaro SS, VIN: 2G1FK1EJ5A9138693, for the total cash price of $31,089.45.
F. On 03-05-12, a 2006 Chevrolet 1500, extended cab, VIN: 1GCEK19V96Z202814, for the total price of $19754.45.
G. On 04-16-12, a 2012 Dodge Challenger, VIN: 2C3CDYCJ4CH229628, for the total price of $49,181.40 which $7000.00 has been paid in cash.

11. Affiant is aware that although this list is not exhaustive and the investigation is ongoing, the above named defendant and his co-conspirator, Tracy Garrison, and other co-conspirators known to the affiant have conducted financial transactions totaling at least $100,707.25 through the Richardson Motor Company.

Affiant is aware that this amount of $100,707.25 represents the proceeds of the above named defendant's specified unlawful activity, namely, the trafficking of controlled substances.

Affiant is aware that in each of these financial transactions the above named defendant did knowingly conceal or disguise the nature, location, source, ownership, or control of the property, namely, the vehicles purchased, by having the purchase orders and/or the registration of the vehicles put in a name other than his (the above named defendant's) own.

Affiant prays for the issuance of the arrest warrant for the above named defendant based on the facts stated above and the probable cause contained therein.


_____ JTP 12ᵉⁿ JDA        2 MAY 12 @ 1925 urs
APPROVED                                        DATE & TIME

_____                       5/2/12 @ 1941 hra.
AFFIANT                                          DATE & TIME

_____                       5/2/12   7:41 p.m.
DISTRICT JUDGE                                   DATE & TIME

STATE OF NEW MEXICO

DISTRICT COURT OF
OTERO COUNTY, N.M.

2012 MAY -3  PM 3: 08

IN THE DISTRICT COURT

_____OTERO_____ COUNTY

STATE OF NEW MEXICO

SW  2012-001

v.                                                              _____

2815 Birdie Loop                                                           Number
**Alamogordo, New Mexico** _____

Defendants(s)

## SEARCH WARRANT

THE STATE OF NEW MEXICO TO ANY OFFICER AUTHORIZED TO EXECUTE THIS WARRANT:

Proof by Affidavit for Search Warrant, having been submitted to me, I am satisfied that there is probable cause that the person named or property described in the Affidavit is located where alleged in the Affidavit and I find the grounds exist for the issuance of the Search Warrant.  A copy of the Affidavit is attached and made a part of this Warrant.

YOU ARE HEREBY COMMANDED to search forthwith the person or place described in the Affidavit between the hours of 6:00 a.m. and 10:00 p.m., unless I have specifically authorized a nighttime search, for the person or property described in the Affidavit, serving this Warrant together with a copy of the Affidavit, and making the search and if the person or property be found there, to seize the person or the property and hold the property and hold for safekeeping until further order of the Court.

You are further directed to prepare a written inventory of any person or property seized.  You are further directed to file the return and written inventory with the Court promptly after its execution.

5/2/12
Date _____                                          _____
                                                                        Judge

## AUTHORIZATION FOR NIGHTTIME SEARCH

I further find that reasonable cause has been shown for nighttime execution of this Warrant.  I authorize execution of this

Warrant at any time of the day or night for the following reasons: _____

_____

(set forth reasons why a nighttime search is necessary)

                                                                 _____
                                                                        Judge

White - Court Copy                    Yellow - Defendant's Copy              Pink - Service Copy

Approved:  Supreme Court, October 1, 1974, amended October 1, 1976 and July 1, 1980.
Criminal Form 2.50 - (1 of 2)

**U.S. v. JOE CHAVEZ, ET AL.,  U.S. v.  RODRIGUEZ, ET AL.,**
**U.S. v. CATT.  U.S. v. RODRIGUEZ          66**

**STATE OF NEW MEXICO**

**IN THE DISTRICT COURT**

_____
**OTERO**        **COUNTY**

**STATE OF NEW MEXICO**

v.

2815 Birdie Loop
Alamogordo, New Mexico
_____

Defendant(s)

SW 2012 -001

Number

**AFFIDAVIT FOR SEARCH WARRANT**

Affiant, being duly sworn, upon his oath, states that I have reason to believe that on the following described premises or person of (here name person and/or described premises)

**SEE EXHIBIT "A"**

in the city or county designated above there now exists (set forth name of person or described property as particularly as possible)

**SEE EXHIBIT "A"**

and that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows: (include facts in support of the credibility of any hearsay relied upon; if necessary, continue on reverse side of this form or on a separate page or pages)

**SEE EXHIBIT "A"**

Subscribed and sworn to or declared and affirmed to before me in the above named county of the State of New Mexico this 2nd day of ___May___, 20 12.

_____
Judge, Notary or Other Officer
Authorized to Administer Oaths

_____
Official Title

_____
Signature of Affiant

_____
Official Title (if any)

NOTE: This affidavit shall be filed in the same file as the search warrant. If no criminal proceedings are filed, the affidavit and warrant shall be filed in a miscellaneous file.

White - Goes with Search Warrant; return to Court    Yellow - Defendant's copy    Pink - Court copy

Approved: Supreme Court, July 1, 1980.
Criminal Form 9-213

U.S. v. JOE CHAVEZ, ET AL.,  U.S. v.  RODRIGUEZ, ET AL.,
U.S. v. CATT,  U.S. v. RODRIGUEZ            67

AFFIDAVIT FOR SEARCH WA     NT                    DISTRICT COURT
        STATE OF NEW MEXICO                         OTERO COUNTY

2815 Birdie Loop
Alamogordo, NM
                VS
State of New Mexico


### EXHIBIT "A" (PAGE 1 OF 3 )

**PLACE TO BE SEARCHED**: The single family dwelling commonly known as 2815
Birdie Loop, Alamogordo, Otero County, New Mexico.  The residence is located
on the North side of Birdie Loop two houses west of Oakmont Drive. The
residence is tan colored with a dark gray pitched shingled roof. The numbers
2815 are displayed in black numbers above the garage facing Birdie Loop. See
photo below for exact description.



## ITEMS TO BE SEARCHED FOR AND SEIZED:

1.  All log books, records, payment receipts, notes, and/or customer
    lists, ledgers, and other papers relating to the ordering,
    purchasing, processing, storage, transfer, and sale of motor
    vehicles.
2.  Books, records, invoices, receipts, records of real estate
    transactions, financial statements, bank statements, canceled
    checks, deposit tickets, passbooks, money drafts, withdraw slips,
    certificates of deposit, letters of credit, loan and mortgage
    records, money orders, bank drafts, cashier's checks, bank checks,
    safe deposit box keys, money wrappers, wire transfer applications
    and/or receipts, fictitious identification, and other items
    evidencing the obtaining, secreting, transfer, concealment, and/or
    expenditure of money. Records of all assets purchased, obtained, and
    sold, all liabilities incurred or disposed of, and all expenditures

paid either ⌐, by the corporation, its ⌐ ¬ cers, its agents, or
their nominees.

3. Indicia of occupancy, residency, rental and/or ownership of the
   premises described above and all vehicles located thereon,
   including, but not limited to utility and telephone bills, canceled
   envelopes, keys, deeds, purchase lease agreements, land contracts,
   titles, and vehicle registrations.

4. Electronic equipment, such as palm pilots, electronic PDA's
   (personal diaries and address books), currency counting machines,
   pagers (digital display beepers), telephone answering machines,
   telephone caller identification boxes, video and audio cassette
   tapes, and any stored electronic communications contained therein.

5. Cellular telephone(s) and/or portable cellular telephone(s), and any
   stored electronic communications contained therein.

6. United States currency, precious metals, jewelry, gold coins, and
   financial instruments, including, but not limited to, stocks and
   bonds.

7. Photographs, including still photos, negatives, video tapes, films,
   undeveloped film and the contents therein, slides, in particular,
   photographs of co-conspirators and assets.

8. Address and/or telephone books, rolodex indices, and any papers
   reflecting names, addresses, telephone numbers, pager numbers, fax
   numbers of co-conspirators, sources of supply, storage facilities,
   customers, financial institutions, and other individuals or
   businesses with whom a financial relationship exists.

9. The opening and search, and removal, if necessary, of any safe or
   locked receptacle or compartment, as some or all of the property
   heretofore may be maintained.

10. Computer system hardware including but not limited to word
    processing equipment, modems, printers, plotters, encryption circuit
    boards, optical scanners, and other computer related devices, and
    software including floppy disks and any other medium which is
    capable of storing magnetic tape or optical coding, software
    programs, and any other programs, or software used to communicate
    with computer hardware or peripherals either directly or indirectly
    via telephone lines, radio, or other means of transmission, computer
    manuals relating to the operation of a computer system, computer
    software, and/or related device.

11. Any and all of the information described above that may be stored on
    magnetic media. This includes information stored on computer hard
    drive, diskettes, tapes, or any other media capable of storing
    information in a form readable by a computer. This also includes all
    copies of the information described above that may be stored on such
    media as archive or backup copies. The agents searching for such
    information are authorized to search:

- Any desktop or other "personal computer" in the business, to copy all of the above referenced information stored on such computer(s) or accessible through such computers, if connected to other computers through a network of computers, and diskettes or tapes found in such residence or business work area;

- Any file(s), storage area or directory on a network server to copy any and all of the above-described information that may be found on computer(s), and any diskettes or tapes that may contain such information; and

- Any other storage area of any file server or computer which the information described above might be found or stored. The search of such computers or storage areas of such computers shall be limited to seeking information that fit within the above-described information.

12. In the event that the agents cannot obtain access to any subject computer or cannot search for or copy information contained on that computer, the agents are then authorized to seize such computer and remove it to a laboratory setting for a sufficient period of time to obtain access to, search for, and recover the files and records described herein. Such computer may be "imaged". An image is a pristine, bit by bit reproduction of the subject's computer hard drive. In addition, if the files and records cannot be read and understood without the software or programs that created those files or records, the agents are authorized to seize such software and any documentation and manuals that describe the software and give instructions on its installation and use.

13. Other fruits and instrumentalities of the crimes of NMSA 30-51-4, 30-51-3, and 30-28-2.

**AFFIANT'S DECLARATION**

#1. Affiant is a full-time salaried peace officer employed by the Otero County Sheriff's Office. Affiant presently holds the position of Narcotics Agent with the Otero County Narcotics Enforcement Unit. Affiant is familiar with Cocaine, Marijuana, Methamphetamine, Heroin, LSD, and other controlled substances, their appearance, street prices, packaging, methods of ingestion and methods of illegal acquisition or sale of such by, illegal narcotic and drug recognition training, in-the-field police experience, and by working and talking with fellow officers, and talking with self admitted users, and dealers of controlled substances. Affiant has been involved in all facets of narcotics investigations, including but not limited to controlled buy operations, criminal informant utilization, warrant applications, surveillance operations involving narcotics trafficking, and the investigation of money laundering activities.

#2 Affiant states that agents from the Otero County Sheriff's Office Narcotics Enforcement Unit conducted an extensive narcotics trafficking

investigation beginning . January 2012 that targe. . criminal enterprise engaged in the transportation of narcotics from Phoenix, Arizona, to Otero County, New Mexico.

#3  Affiant is aware from previous investigations that the individual responsible for organizing the transportation of the narcotics is positively identified as Robert Chavez. Affiant is aware Robert Chavez resides at 780 Cholla Avenue, Alamogordo, Otero County, New Mexico, with his live-in girlfriend, identified as Angela Catt.

#4  Affiant is aware through this extensive narcotics trafficking investigation Robert Chavez's co-conspirators are his brother Joe Chavez and his girlfriend identified as Tracy Garrison.

#5  Affiant assisted in this extensive narcotics trafficking investigation. On 5/1/12, this investigation resulted in the arrest of Robert Chavez for trafficking a controlled substance to wit: approximately 4lbs of methamphetamine, which was found concealed in the spare tire of a Chevy Silverado previously purchased by Robert Chavez.

#6  Affiant learned a District Court search warrant for Robert Chavez's residence, located at 780 Cholla Avenue, Alamogordo, NM was granted and executed.

#7  Affiant participated in the search of 780 Cholla Avenue and learned a recent cash purchase document from Richardson Motor Company for a 2010 Mercedes Benz by Robert Chavez was located. The document showed that the Mercedes Benz was purchased for $27,000 cash. This amount, $27,000, was paid from Robert Chavez to Richardson Motor Company in $9000 increments starting on 03/31/12, with the second following on 04/15/12, and the final payment being remitted to Richardson Motor Company on 04/24/12.

#8  Affiant also learned at least two other vehicles were purchased from Richardson Motor Company. The first was a 2010 Toyota Tundra crew cab which was purchased for $29,000, of which $19,000 was a trade allowance and $10,000 was in cash. A 2010 Chevrolet Camaro SS purchased for $34,000 was also purchased.

#9 Affiant learned a search warrant for documents was applied for and granted for the business of Richardson Motor Company. Affiant learned several documents were seized including cash purchase orders of approximately six vehicles to Tracy Garrison.

#10 Affiant is aware through extensive investigations and surveillance, Tracy Garrison currently resides at 2518 Birdie Loop with Joe Chavez.

#11 Affiant is aware through prior investigations, Tracy Garrison lists her address as ███████████ Affiant knows through prior investigations the current residents of ███████████ are Boyde Greenwood and Donna Greenwood. Affiant is aware Donna Greenwood is the biological mother of Tracy Garrison.

#12 Affiant learned through evidentiary documents seized from Richardson Motor Company, Tracy Garrison lists the address of ███████████ as her current address on all purchase orders.

#13 Affiant learned from OCNEU Commander Neil LaSalle, Joe Chavez was observed at Richardson Motor Company on 5/2/12. Affiant learned from Commander LaSalle he spoke with the owner of Richardson Motor Company identified as Robbie Richardson. Affiant learned from Commander LaSalle, Robbie Richardson advised Joe Chavez about the investigation of money laundering

#14 Affiant prays for issuance of this search warrant, as he believes, that in the address described above, evidence associated with laundering of monetary instruments and conspiracy will be recovered.


ADA Kirby Wills
APPROVED

_5/2/12 @ 1715 hrs_
DATE AND TIME

AFFIANT

_5/2/12   1930 hrs_
DATE AND TIME

DISTRICT JUDGE

_5/2/12   7:30 p.m._
DATE AND TIME

OTERO COUNTY NARCOTIC ENFORCEMENT UNIT
(x) ORIGINAL ( ) SUPPLEMENT

| REPORT OF INVESTIGATION | | Page 1 of 5 | |
|---|---|---|---|
| 1. PROGRAM CODE<br><br>HIDTA | 2. RELATED<br><br>CROSS FILES | 3. FILE NO.<br>████████ | 4. G-DEP<br><br>IDENTIFIER |
| 5. BY:    R. Scharmack<br><br>AT:   NEU | ████████ | 6. FILE TITLE<br>Chavez, Joe | |
| ☐ CLOSED    ☐ REQUESTED ACTION COMPLETED    ☐ ACTION REQUESTED BY: | | | |
| 8.  DATE PREPARED:    5-3-12 | | | |
| 9.  OTHER OFFICERS:    See witnesses listed below. | | | |
| 10.  REPORT RE: | Search warrant on defendant's address. Located illegal narcotics and paraphernalia. Defendant received numerous charges and linked to a money laundering scheme. | | |

DEFENDANT: Joe Chavez.DOB ████████ , SOC ████████

ADDRESS: 2815 Birdie Loop. Alamogordo, New Mexico PHONE#:

VIOLATION:
Count 1: Money Laundering
Count 2: Possession of controlled substance with intent to distribute
Count 3: Possession of Drug Paraphernalia
Count 4: Possession of forfeitable property.

JUDICIAL DISTRICT: 12th Judicial District

DATE, TIME AND PLACE: On May 2, 2012, at approximately 2356 hours, at 2815 Birdie Loop., Alamogordo, Otero County, NM.

EXHIBITS AND CUSTODY THEREOF:
1. 12.8 ounces (approximate) of marijuana
2. Numerous paraphernalia items
3. $32,455.05 in US Currency

WITNESSES:
1. Agent P. Eldridge, OCNEU
2. Agent K. Syling, OCNEU
3. Agent M. Johnston, OCNEU
4. Agent D. Flores, OCNEU
5. Commander N. LaSalle

VEHICLE:
```
1. 2011 Silver Dodge Charger, NM ███████, VIN - █████████████
2. 2010 Silver Chevy Camero SS, NM ██████, VIN - ████████████████
3. 2012 Yellow Dodge Challenger, NM Temp, VIN - █████████████
```

DETAILS:

On Tuesday, May 1, 2012, I (Agent Rodney Scharmack) assisted in a narcotics search warrant at 780 Cholla Avenue. During the execution of the search warrant, I learned documents were seized from the residence indicating cash sales of several vehicles to Robert Chavez from Richardson Motor Company. I learned Robert Chavez was subsequently arrested for and charged with trafficking a controlled substance, possession of a firearm by a felon and possession of forfeitable property. Refer to HIDTA report # ██████ for further details.

With the documents seized from Robert Chavez's residence, a District Court documents search warrant was applied for and granted for the business of Richardson Motor Company. I learned that during the execution of the search warrant several documents were seized including cash purchase orders of approximately six vehicles to Tracy Garrison and Joe Chavez. I was aware Tracy Garrison is the long time girlfriend of Joe Chavez. I know Joe Chavez is the brother of Robert Chavez and they are known to have the "AZ Boys" moniker on the streets. Refer to HIDTA report # ██████ for further information regarding the search warrant at Richardson Motor Company.

With the information received from the evidence seized at Richardson Motor Company, I applied for and was granted a District Court search warrant for documents for the addresses of 2815 Birdie Loop and ████████████. 2815 Birdie Loop is the known address of Joe Chavez and Tracy Garrison. ████████████ is the listed address on the purchase orders from Richardson Motor Company. I am aware through prior investigations that the address of ████████████ is the address of Donna Greenwood who is the mother of Tracy Garrison.

I learned from Agent P. Eldridge documents seized from Richardson Motor Company were purchase orders showing cash sales from Tracy Garrison and Joe Chavez. I learned Agent Eldridge made contact with Kelly Mercer from New Mexico Workforce Solutions. She was able to provide information about Joe Chavez and Tracy Garrison. It was learned that Joe Chavez has never had employment in the state of New Mexico and Tracy Garrison has not had employment since 2008. I am aware that several purchases of methamphetamine were conducted with Joe Chavez utilizing documented reliable informants. This led us to believe the purchases of several vehicles were made without a viable source of income and with the proceeds from drug transactions. With that information and the evidence seized consistent with money laundering, Agent Eldridge applied for and was granted an arrest warrant for Joe Chavez for Money Laundering. This arrest

warrant was going to be served at the time of the documents search warrant.

On May 2, 2012 at approximately 2140 hours, OCNEU Agents and OCSO Deputies executed the search warrant and arrest warrant for Joe Chavez at 2815 Birdie Loop. Deputies knocked and announced our presence however no one came to the door. A breach of the door was conducted and a safety sweep of the house was initiated. Deputies came to a locked door leading to the master bedroom on the north east side of the house. Deputies knocked on the door and directed anyone who was in the room to come out with their hands up. Deputies breached the bedroom door and located Joe Chavez laying in bed with blankets covering him. The blankets were removed and Joe Chavez was taken into custody.

Deputies cleared the rest of the residence and began the search. I began to search the master bedroom. I opened the top left drawer of the dresser on the north side of the room and located a large gallon sized Ziploc bag containing a large amount of green leafy substance I recognized as marijuana. The marijuana was left in the drawer at this time. I then opened the top right drawer of the dresser. I located a single vehicle key with an identification tag indicating a 2006 Suzuki Wagon. Agent Eldridge and I recognized this key as matching the description of a vehicle set on fire in a recent homicide investigation. Agent Flores, while searching the master bedroom walk in closet, located a Glock firearm magazine sitting on a shelf. Deputies are aware that Joe Chavez is a prior convicted felon. With the marijuana, the Glock magazine and the potential ignition key to a homicide investigation located deputies backed out of the residence and secured it pending another search warrant.

I left the scene to obtain a narcotics search warrant. I applied for and was granted a narcotics search warrant to go along with the documents search warrant. The warrant included illegal narcotics, firearms, and items that could be related to the homicide of Richard Valdez.

Deputies and Agents re-enter the residence to execute the search warrants. The following items were located and seized:
1.  $29,363.00 in US currency located in the top drawer of the tv stand in the master bedroom.
2.  An ignition key to a 2006 Suzuki wagon located in the top right drawer of the dresser in master bedroom.
3.  5 unidentified white tablets located in the top drawer of chest in master bedroom.
4.  $905 in US Currency in a pill bottle in the nightstand in master bedroom.
5.  $68 in $2 bills in US currency in the nightstand in master bedroom.
6.  Gallon sized Ziploc bag containing large amount of marijuana located in the top left drawer of the dresser in the master bedroom.
7.  Several older Alamogordo Daily News papers depicting the homicide investigation of Richard Valdez were located in the TV stand in the master bedroom.

U.S. v. JOE CHAVEZ, ET AL., U.S. v. RODRIGUEZ, ET AL.,
U.S. v. CATT. U.S. v. RODRIGUEZ          58

I was able to obtain information from Ms. Kelly Mercer, who is a Special
Agent for the New Mexico Department of Taxation of Revenue, that Joe
Chavez and Robert Chavez have not had reportable income in the state of
New Mexico. I learned from Ms. Mercer that Tracy Garrison has not had any
reportable income in the state of New Mexico since 2008. I learned from
Ms. Mercer that Angela Catt has not had any reportable income in the state
of New Mexico since 2002. Ms. Mercer was able to obtain that information
through a database shared with New Mexico Department of Workforce
Solutions.  New Mexico Department of Workforce Solutions is the current
name for the state department of labor.

Since the Chavez brothers and their nominees - the people in whose names
they placed assets to conceal their nature, ownership, or source - have no
reportable income in the state of New Mexico during the timeline of the
money laundering investigation, their money was suspected to be generated
from illegal drug transactions.

Since March of 2011, I was able to participate in several drug
transactions between a confidential reliable informant and Joe Chavez.
Agent Preston Eldridge of the OCSO was able to witness Joe Chavez driving
to and leaving the area of a drug transaction. Agent Eldridge received
information from a confidential reliable informant that Joe Chavez was in
route to his house to sell illegal narcotics. Agent Eldridge, with that
information, proceeded to the area and observed Joe Chavez driving a
silver in color Camaro SS to and from the confidential reliable
informant's house. Agent Eldridge was able to confirm with OCSONEU
Commander Neil LaSalle that the silver Camaro SS seen going to and leaving
the confidential reliable informant's house was in fact Joe Chavez's
vehicle.

I was able to participate in the investigation of Robert Chavez in which
he traveled to Phoenix, Arizona, and transported approximately 4 pounds of
methamphetamines back to Alamogordo, New Mexico. During the investigation,
Robert Chavez drove a black in color Mercedes GLK to Phoenix, Arizona, and
back to Alamogordo, New Mexico. Robert Chavez followed a white in color
Chevy pickup truck carrying the suspected 4 pounds of methamphetamines
from Phoenix, Arizona to Alamogordo, New Mexico. I was able to witness
Robert Chavez in Socorro, New Mexico driving a black Mercedes GLK stop at
a gas station and exit the black Mercedes. The white in color pick up
truck proceeded to the same gas station as to where I observed Robert
Chavez exit the driver seat of the black Mercedes and once at the gas
station a female subject exited the driver seat of the vehicle.

These facts, coupled with the Chavez brothers' complete lack of legitimate
income, support the fact that the money that the Chavez brothers possessed
derived from illegal drug trafficking in and around the city of
Alamogordo, New Mexico.

With the money the Chavez brothers obtained through their illegal drug
transactions, they proceeded to Richardson Motor Company and purchased

**Page 1**

```
 1              IN THE MATTER OF:
 2
 3
 4
 5
 6
 7  AN INVESTIGATION AGAINST JOE AND BOB CHAVEZ.
 8
 9
10
11
12
13
14
15          INTERVIEW OF PRESTON ELDRIDGE
16                  September 4
17
18
19
20
21
22
23
24
25
```

**Page 2**

```
 1      MR. ORTIZ:  So it's Wednesday, September
 2  the 4th.  We're in the offices of the district
 3  attorney's office.  My name is Matthew Ortiz.  I'm
 4  the attorney for Joe Chavez.
 5          EXAMINATION
 6  BY MR. ORTIZ:
 7      Q.  What's your name?
 8      A.  Preston Eldridge.
 9      Q.  Okay.  What's your position now?
10      A.  Deputy sheriff.
11      Q.  When did you become deputy sheriff?  How
12  long have you been a deputy sheriff?
13      A.  I don't know, a couple years, I guess.
14      Q.  Okay.  When did you leave the Narcotics
15  Unit?
16      A.  Last year.
17      Q.  Okay.  What reason did you leave the
18  Narcotics Unit?
19      A.  Just ready for a change.
20      Q.  How come?
21      A.  I was ready for a change.
22      Q.  Okay.  Deputy Eldridge, you see that
23  there's a number of tape recorders in front of you?
24      A.  Uh-huh.
25      Q.  Yes?
```

**Page 3**

```
 1      A.  Yes.
 2      Q.  Okay.  So you understand that you're being
 3  tape recorded?
 4      A.  Uh-huh.
 5      Q.  And you understand that you've got to --
 6  that you're going to tell us the truth today?
 7      A.  Yeah.
 8      Q.  Okay.  And because you're being tape
 9  recorded, we need -- I can see you're nodding up and
10  down so I know what that means, but because these
11  tapes are going to be transcribed at some point in
12  the future, you're going to need to give an
13  affirmative or negative answer.  You understand
14  that, right?
15      A.  I do.
16      Q.  Okay.  So tell me, how long were you in the
17  Narcotics Unit?
18      A.  With the sheriff's office, about a year.
19      Q.  Okay.  And what time period were you in
20  that unit, if you can best recall?
21      A.  The middle of 2011 until the middle of
22  2012.
23      Q.  And did you receive any training or classes
24  while you were in the Narcotics Unit?
25      A.  Yeah.
```

**Page 4**

```
 1      Q.  What kind of training did you receive?
 2      A.  Narcotics trainings.
 3      Q.  What does that entail?  How did you get it
 4  or what -- did you take classes?  Did you just
 5  get -- take online classes?  What kind -- how would
 6  you describe the training that you received in
 7  narcotics?
 8      A.  Well, at some point I went to the DEA basic
 9  narcotics school in Albuquerque.  That was two
10  weeks.  I went to several other classes.  I don't
11  remember what they were right offhand, but --
12      Q.  And the other classes that you took that
13  you can't recall, were they all based in narcotics?
14      A.  Yeah.
15      Q.  Did you have any training or did you take
16  any classes in money laundering?
17      A.  I did not, no.
18      Q.  Have you taken or -- have you taken any
19  classes in racketeering or in other -- any other
20  white collar crime?
21      A.  No.
22      Q.  Are you the lead agent in these cases, the
23  cases of my client Joe Chavez?
24      A.  I don't know.
25      Q.  Since you have left the Narcotics Unit,
```

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

Page 5

1  have you been given any assignments by either the
2  district attorney's office or by the Otero County
3  Sheriff's Department related to the case against Joe
4  and Bobby Chavez?
5      A.  I can't think of any specific assignments.
6  I sat in federal court the last several days.
7      Q.  Okay.  You were in federal court last week?
8      A.  Uh-huh.
9      Q.  Yes?
10      A.  Yes.
11      Q.  Okay.  So you testified at the trial of
12  Bobby Chavez?
13      A.  I did.
14      Q.  Okay.  What documents did you review before
15  you testified before -- in federal court?
16      A.  My report.
17      Q.  You filed a number of reports, didn't you?
18      A.  I did.
19      Q.  Did you review all of those reports before
20  you testified?
21      A.  No.
22      Q.  Did you only look at the reports that --
23      A.  Pertaining to the trial.
24      Q.  Did you review any documents prior to
25  coming to this interview today?

Page 6

1      A.  Nope.
2      Q.  When was the last time that you looked at
3  any file related to Joe Chavez?
4      A.  I don't know.
5      Q.  It's been a while?
6      A.  It's been a while, yeah.
7      Q.  Okay.  Can you tell me how you first came
8  into contact with Sonia Sanders?
9      A.  I caught her selling dope.
10      Q.  When was that?
11      A.  I don't know the exact date.  It was before
12  all this started.
13      Q.  Okay.  Where did you catch her?
14      A.  In Alamogordo.
15      Q.  Where?
16      A.  I believe it was LaValle Road or somewhere
17  by LaValle and 70, somewhere out there.
18      Q.  And what kind of controlled substance was
19  she carrying?
20      A.  Methamphetamines.
21      Q.  Did you place her under arrest?
22      A.  Nope.
23      Q.  What did you do?
24      A.  Told her I had a search warrant, and she
25  gave up the dope and wanted to work.

Page 7

1      Q.  So you obtained a search warrant prior to
2  initiating contact with Sonia Sanders?
3      A.  Yes, I did.
4      Q.  Describe the circumstances of how you came
5  to get a search warrant on someone -- on Sonia
6  Sanders.
7      A.  We were buying methamphetamines from her.
8  Informants saw a large amount of dope on her, so we
9  got a search warrant for her.
10      Q.  So you had been working with a confidential
11  informant prior to arresting Sonia Sanders?
12      A.  Yes.
13      Q.  Okay.  And as far as you know, is Otero
14  County still using that confidential informant?
15      A.  I do not know.
16      Q.  Have you used or had any interaction with
17  that confidential informant?
18      A.  No.
19      Q.  If you can remember, for how long had you
20  been working with this confidential informant buying
21  controlled substances from Sonia Sanders?
22      A.  I don't know.  No clue.
23      Q.  No clue at all?  You don't know if it was a
24  day or a week or a month?
25      A.  No, I don't remember.

Page 8

1      Q.  Okay.  Is there any document that you can
2  refer to that would refresh your recollection on how
3  long you were using a confidential informant?
4      A.  No.
5      Q.  Okay.  And when you were using this
6  confidential informant, in what amounts were you
7  making buys of controlled substances, either in
8  dollar amount or in weight.  Can you remember that?
9      A.  No.  Small amounts, personal use.
10      Q.  Small amounts, so less than, what, two
11  grams, one gram?
12      A.  Yeah, it could have been.  I don't know.
13      Q.  Okay.  How many buys do you remember making
14  before you got the search warrant on Sonia Sanders?
15      A.  I remember -- I remember a couple of buys,
16  but I don't know exactly how many we did.
17      Q.  It's got to be less than five, you think?
18      A.  I don't know.
19      Q.  Okay.
20      UNIDENTIFIED MALE:  Just to clarify, would
21  you please just indicate whether you mean buys from
22  Sonia or buys in the CI of other people.  That was
23  unclear.
24      Q.  (By Mr. Ortiz)  Did you use a confidential
25  informant to arrange buys from Sonia Sanders?

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

Page 9

1    A.  Yes.
2    Q.  Okay.  And those buys were a couple of
3  times but you're not sure on the amount; is that
4  right?
5    A.  Correct.
6    Q.  And you're also not sure of the time period
7  in which you were using a confidential informant to
8  make buys from Sonia Sanders; is that right?
9    A.  It had to be between the middle of 2011 and
10  the time we caught her.
11    Q.  Okay.  But you can't tell me when you
12  caught her?
13    A.  No, I can't.
14    Q.  Okay.  It was before you initiated the
15  Arizona trip in which Sonia Sanders went with Bobby
16  Chavez and Angela Catt, though, right?
17    A.  That is correct.  That is correct.
18    Q.  Okay.  Was it a week before the Arizona
19  trip or a month before?  Can you remember?
20    A.  No.
21    Q.  Is there any documents in the file, as far
22  as you know, that would refresh your recollection as
23  to the period of time in which you got a search
24  warrant on Sonia Sanders?
25    A.  No.

Page 10

1    Q.  Is it the practice of the Narcotics Unit to
2  not issue reports as it relates to its use of
3  confidential informants, as far as you know?
4    A.  Well, there's certain things you don't
5  document about informants, but --
6    Q.  I'm not asking the identity of the
7  confidential informants.
8    A.  I know you're not.
9    Q.  We went through that yesterday with Neil
10  LaSalle.  I'm asking you just about the basic facts
11  of which led you to Sonia Sanders.
12    A.  Yeah.  Can we talk about the case?  That's
13  why I'm here.  I don't have much time, guys.  I'm
14  not going to waste time here.
15    Q.  Are you here subject to a subpoena?
16    A.  I am, but --
17    Q.  Okay.
18    A.  -- let's -- let's talk about the case.
19    Q.  Okay.  Sonia Sanders is a part of this
20  case, isn't she?
21    A.  She is.
22    Q.  Okay.  And you were her principle contact
23  all throughout the investigation of Robert and Joe
24  Chavez, weren't you?
25    A.  In Phoenix she was talking to me, yes.

Page 11

1    Q.  Okay.  And you set with Sonia Sanders --
2  Sonia Sanders on the Arizona trip, didn't you?
3    A.  I did what?
4    Q.  You set up Sonia Sanders to go on the
5  Arizona trip, didn't you?
6    A.  Neil had more to do with that than I did.
7  Bobby and them had more to do with that.  They set
8  her up to go.  We just knew that she was going.
9    Q.  And you knew that she was going because you
10  executed the search warrant on her, didn't you?
11    A.  After I executed the search warrant, she
12  told us, "I haul dope for these guys."
13        "Great.  Let's catch them."
14    Q.  Okay.  And you told her that, right?
15    A.  I don't recall specifically me telling her
16  that, but --
17    Q.  Well, who told her?
18    A.  Well, the Narcotics Unit was out there, so
19  somebody told her.
20    Q.  It wasn't you?
21    A.  I don't know if it was me.  I had a lot of
22  contact with her.  Neil LaSalle had a lot of contact
23  with her.  Every agent there had contact with her.
24    Q.  So let's talk about your contact with Sonia
25  Sanders.  Okay.  After you executed the search

Page 12

1  warrant on her, what did you do?
2    A.  We took her to a private place and talked
3  to her.
4    Q.  What private place did you take her to?
5    A.  That's irrelevant.  We took her to a
6  private place in Otero County and spoke to her.
7    Q.  Is the private place some safe house or
8  some residence that's used by Otero County Sheriff's
9  Department?
10    A.  No.  It was in the middle of nowhere in the
11  desert.
12    Q.  Okay.  And when you took her out to the
13  middle of nowhere in the desert, what did you tell
14  her?
15    A.  We asked her how this operation works.  She
16  told us.
17    Q.  Did you promise her that charges wouldn't
18  be brought against her if she cooperated with you?
19    A.  I don't remember if we promised her, but
20  I'm sure we told her that, "You can work these
21  charges off."
22    Q.  By doing what?
23    A.  By helping us catch Robert and Joe Chavez.
24    Q.  And what do you remember her telling you?
25    A.  I don't -- I don't know.  She said she

**Page 13**

1  would do it.
2  Q.  Do you remember her telling you anything
3  else?
4  A.  Just how the operation works.
5  Q.  Tell me what you remember Sonia Sanders
6  telling you about how the operation works.
7  A.  It's too open-ended.  I don't -- I don't
8  know.
9  Q.  You don't know what she told you?
10  A.  No, I do not know specifically what she
11  told us.  I know that she told us how the operation
12  works and that she would be making a trip soon.
13  Q.  Okay.
14  A.  And we wanted to go with her on it.
15  Q.  And who told her that you wanted to go --
16  that the Narcotics Unit wanted to go on the trip
17  with her?
18  A.  We all did.
19  Q.  So who was with you in the middle of
20  nowhere in the desert when you were with Sonia
21  Sanders?  There was you?
22  A.  Uh-huh.
23  Q.  Yes?
24  A.  Yes.
25  Q.  And there was Neil LaSalle?

**Page 14**

1  A.  Yep.
2  Q.  Who else from the Narcotics Unit?  Dustin
3  Flores, was he there?
4  A.  He was there.  Matt Johnston.
5  Q.  Matt Johnston from border patrol?
6  A.  Uh-huh.
7  Q.  Okay.  Anyone else?
8  A.  Not that I remember.  Sonia.
9  Q.  So it was the four of you and Sonia
10  Sanders, and you took her out to the middle of
11  nowhere in the desert and you -- you told her that
12  she had the opportunity to work these charges off if
13  she helped you take down the operation; is that
14  right?
15  A.  That is correct.
16  Q.  Okay.  And you can't tell me now what Sonia
17  Sanders told you in the middle of nowhere in the
18  desert about what the operation entailed; is that
19  right?
20  A.  I could tell you what she said about the
21  operation, yeah.
22  Q.  So tell me.  What did she say about the
23  operation?
24  A.  She goes out there, picks it up and drives
25  it back.  They follow her back.

**Page 15**

1  Q.  Did you ask her at this time how many trips
2  she had taken?
3  A.  We did.  I think she said she had made one
4  before.
5  Q.  Did she tell you who went out with her to
6  Arizona?
7  A.  I don't recall if she did or not.
8  Q.  Did she tell you what kind of -- did she
9  tell you what she transported?
10  A.  Narcotics.
11  Q.  Was she specific as to what type of
12  narcotics or controlled substance?
13  A.  I don't recall.  I don't remember if she
14  was or not.
15  Q.  Okay.  How long do you think this encounter
16  that you had with Sonia Sanders in the middle of the
17  desert -- how long do you think that was?
18  A.  I don't know.  It was short.  I don't know.
19  Q.  What happened next after this encounter?
20  Did you bring her back?  Did you release her from
21  custody?
22  A.  We released her.  She told us that she
23  would let us know when they were making their trip.
24  UNIDENTIFIED MALE:  Preston, when you say
25  "they" -- I'm sorry to interrupt.  But when you say

**Page 16**

1  "they," who is they?
2  THE WITNESS:  Bob and Angela.
3  Q.  (By Mr. Ortiz)  And what time of day was it
4  when you had this encounter with Sonia Sanders in
5  the middle of nowhere?
6  A.  In the evening.
7  Q.  Late evening?  Early morning?
8  A.  No.  It was in the evening.
9  Q.  And so you released her?
10  A.  Yep.
11  Q.  Did you confiscate the controlled
12  substances you found on her?
13  A.  Of course we did.
14  Q.  Did you enter them into evidence?
15  A.  Yep.
16  Q.  Did you initiate a case file on her or was
17  there a case file already on her?
18  A.  We pulled a case file on her.
19  Q.  How long after this initial encounter you
20  had with Sonia Sanders did she call you about a trip
21  to Arizona?
22  A.  Roughly a week or so.  I don't know.
23  Q.  Did you give her your contact information?
24  A.  Yes, I did.
25  Q.  Did you give her your cell phone number?

54

**Page 17**

1    A.  Yep.
2    Q.  Is that the same cell phone number --
3    A.  No.
4    Q.  -- that you had back then?
5    A.  No, it's not.
6    Q.  Okay.  So when she contacted you, what do
7    you remember her saying?
8    A.  She's going to Phoenix to meet him to bring
9    the stuff back.
10    MS. RICE:  Hi.
11    UNIDENTIFIED MALE:  And this is Clarissa
12    Rice from the Public Defender's Office.
13    MR. ORTIZ:  Oh, okay.
14    UNIDENTIFIED MALE:  And Michael Keedy, the
15    district defender, is representing Tracy.
16    MR. ORTIZ:  Tracy Garrison, okay.
17    UNIDENTIFIED MALE:  So this is their
18    investigator.
19    MR. ORTIZ:  Okay.  Hi.
20    MS. RICE:  Hi.
21    Q.  (By Mr. Ortiz)  So after she contacted you
22    and told you that there was going to be an Arizona
23    trip, what actions did you take?
24    A.  We went to Las Cruces, rented some
25    vehicles, met her on the road, followed her out

**Page 18**

1    there.  Waited in Phoenix for her.  We did
2    surveillance on the house to -- she was there.  We
3    saw Bob and Angela's vehicle there.  Stayed in
4    contact with her throughout the week.  She finally
5    called and said, "Okay.  We're leaving.  We got four
6    pounds of meth loaded in the truck."
7    Q.  She told you that there was four pounds of
8    meth loaded in the truck?
9    A.  Yep.
10    Q.  Were you -- for the entire duration of the
11    Arizona trip, were you her primary contact?
12    A.  I was, yeah.
13    Q.  Okay.  And how did she communicate with
14    you?  Was it via text or did you talk over the phone
15    or did you do a combination of both?
16    A.  Both, yeah.
17    Q.  Before you went on the Arizona trip, did
18    you or anyone in the Narcotics Unit have to get
19    preapproved or have to get some kind of authority to
20    leave your jurisdiction?
21    A.  Uh-huh.
22    Q.  Yes?
23    A.  Yeah, we did.
24    Q.  Who did you get that approval from?
25    A.  HSI, Homeland Security.  I went to

**Page 19**

1    Las Cruces and had a meeting with them myself.
2    They -- they advised they were in.  Brian Cotch is
3    the contact.  I told them this could go tonight, it
4    could be a week from now.  You let us know when
5    you're -- or we'll let you know.  He said, "Okay."
6    On our way we called him, told them this was
7    happening.  He said he was tied up.  He couldn't go
8    at that moment, but put us in contact with the
9    Phoenix HSI agents.  And so we were in contact with
10    them.
11    Q.  Okay.  And you were the person who got that
12    approval from Homeland Security?
13    A.  That is correct.
14    Q.  Okay.  So prior to leaving on the Arizona
15    trip, did you give any specific instructions to
16    Sonia Sanders?
17    A.  Just do her thing.  Make it look normal.
18    Q.  Did you or anyone in narcotics -- in the
19    Narcotics Unit give her any promises about what
20    would happen after she came back from Arizona?
21    A.  No.  We weren't sure what was going to
22    happen.
23    Q.  Okay.  How long do you think -- while you
24    were in Arizona, how long do you think that you
25    conducted surveillance on the house, the Phoenix

**Page 20**

1    house?
2    A.  Every day.  I don't know how long it was.
3    We were there five days.  We conducted surveillance
4    every day on the place.
5    Q.  Did you conduct surveillance continuously
6    or periodically?
7    A.  It was periodically.
8    Q.  And what did the surveillance consist of?
9    A.  Both vehicles being at the house.
10    Q.  What did you do as part of your
11    surveillance?  What did you do?  Did you remain
12    stationary?  Did you do -- did you drive by?
13    A.  No, you'd have to drive by.  There was
14    nowhere to sit.  And Bob and Angela both know us
15    very well, so we didn't want them to see us.
16    Q.  Who took the photographs of the Phoenix
17    house?
18    A.  I don't -- I don't remember.
19    Q.  Did you take any photographs?
20    A.  I don't think I did, but I don't know.
21    Q.  How many times do you think that you and
22    Sonia were in contact or communication with each
23    other during the five-day period?
24    A.  A lot.  I don't know.
25    Q.  So there was never a period during that

55

**Page 21**

1  five days in which there was not any communication
2  between you and Sonia? You were always in --
3  A. Yes, we were always in contact with each
4  other.
5  Q. From the time that you left here until the
6  time that the vehicles returned?
7  A. Correct.
8  Q. Now, with respect to Joe Chavez, did you
9  participate in the execution of the search warrant?
10  A. I did.
11  Q. What did you find? What did you observe
12  when you went into Joe Chavez's house?
13  A. What are you asking me?
14  Q. What did you observe when you went into Joe
15  Chavez's house to execute the search warrant?
16  A. The living room.
17  Q. What did you -- your participation in the
18  search warrant in Joe Chavez's house was limited to
19  his living room?
20  A. No. I ended up going through the rest of
21  the house, but --
22  Q. Okay.
23  A. Are you asking me what we found when we
24  searched the house?
25  Q. What was the reason for execution of the

**Page 22**

1  search warrant at Joe Chavez's house? What were you
2  looking for?
3  A. Evidence of money laundering.
4  Q. Okay. And what in particular were you
5  looking for as evidence of money laundering?
6  A. Documents.
7  Q. Documents related to what?
8  A. Money laundering, vehicles. Stuff like
9  that.
10  Q. Okay. And when you performed the search of
11  Joe Chavez's house, you didn't find any documents
12  of -- evidence of money laundering, did you?
13  A. I don't remember what we found. I remember
14  we found some marijuana and 30,000 cash and the keys
15  to the burnt vehicle and Joe himself. We had an
16  arrest warrant for him too.
17  Q. And you had an arrest warrant for Joe based
18  on money laundering, right?
19  A. Correct.
20  Q. Did you write the arrest warrant for Joe
21  Chavez?
22  A. I don't remember if I did. I may have. I
23  don't know.
24  Q. And you remember testifying before the
25  grand jury, right?

**Page 23**

1  A. Uh-huh.
2  Q. Yes?
3  A. Yes, I do.
4  Q. And you remember telling the grand jury
5  that you didn't find any documents of money
6  laundering when you searched Joe Chavez's house,
7  right?
8  A. I don't remember saying that, but --
9  Q. Okay.
10  A. I was to speed on the case then so maybe I
11  did.
12  Q. Okay. So did you find the controlled
13  substances in Joe Chavez's master bedroom or was it
14  another officer who found it?
15  A. I remember I was standing right there when
16  it was found, but I don't know if I was the first
17  one to see it or not.
18  Q. Did you take any action as a result of
19  locating the controlled substances?
20  A. Yeah.
21  Q. What did you do?
22  A. I kicked everybody out of the house and
23  applied for a second search warrant.
24  Q. And what steps did you take to get the
25  second search warrant?

**Page 24**

1  A. Somebody went -- I stayed with the house to
2  make sure nobody entered the house while it was
3  secured, so I don't know. Somebody went and wrote a
4  second search warrant.
5  Q. Okay. And that second search warrant was
6  to conduct a search of what?
7  A. The house.
8  Q. So you had a first search warrant to
9  conduct a search warrant for evidence of money
10  laundering, and you were looking for documents of
11  vehicles, right?
12  A. Correct.
13  Q. Okay. And you went through the house and
14  you didn't find that evidence, but you found
15  evidence --
16  A. We didn't go through the house. You're
17  mistaken.
18  Q. You didn't go through the --
19  A. We went into the house to clear it for
20  people, took Joe into custody. They opened a drawer
21  in the -- in the bedroom --
22  Q. Okay.
23  A. -- and found the marijuana and the keys.
24  It was all simultaneously. So I shut it down right
25  there. I said, "We're done. Back out. We're going

Search warrant of 1815 Michele Loop

**Page 25**

1 to get another search warrant."
2     Q. And when you got the second search warrant,
3 did you then conduct a full sweep of the house?
4     A. We did, yes.
5     Q. Okay. And in that full sweep of the house,
6 did you find any evidence of any documents related
7 to money laundering?
8     A. I don't know. I don't recall. I'd have to
9 go back and look through it all. I don't know.
10     Q. Okay. Did you contact any other law
11 enforcement agency when you conducted the sweep of
12 Joe Chavez's house?
13     A. No, I don't believe so.
14     Q. Did you perform the inventory of the
15 property that was seized from Joe Chavez's house?
16     A. I don't know.
17     Q. As a result of the search warrant of Joe
18 Chavez's house, did you take actions to execute a
19 search warrant for storage units?
20     A. We did, yes.
21     Q. Did you write those search warrants?
22     A. I don't know.
23     Q. Did you go on the execution of the search
24 warrant --
25     A. On some of them, yeah. I didn't go on all

**Page 26**

1 of them, but I did go on some of them.
2     Q. The search warrants of the storage units,
3 was it for the same reason as the search for Joe's
4 house, to find evidence of money laundering?
5     A. I'm sure there was narcotics trafficking
6 involved in there too. I don't know.
7     Q. Okay. And did you find -- do you recall
8 finding any documents in the storage units that
9 related to evidence of money laundering, as far as
10 you could tell?
11     A. No. We found evidence in the storage units
12 related to other stuff, but I don't recall the money
13 laundering.
14     Q. Okay.
15         EXAMINATION
16 BY MR. WELLS:
17     Q. Did you seize any vehicles from the search
18 warrants?
19     A. We did.
20     Q. At the storage units?
21     A. At the storage units, at the house. Both.
22     Q. And were those vehicles evidence of money
23 laundering?
24     A. They were.
25

**Page 27**

1         FURTHER EXAMINATION
2 BY MR. ORTIZ:
3     Q. How were those vehicles evidence of money
4 laundering?
5     A. Because he was purchasing them from Robby
6 Richardson's.
7     Q. So purchase of a vehicle is evidence of
8 money laundering?
9     A. When you're paying that much cash and don't
10 have a job, it is, yeah. And haven't had a job or
11 never paid taxes. So, yeah, it is.
12     Q. Okay. And that's -- that's your opinion,
13 right, or is that a fact based upon your
14 investigation of this case?
15     A. I would say it's a fact.
16     Q. Okay. So what evidence do you have that
17 paying cash for a vehicle is evidence of money
18 laundering?
19     A. Where did that money come from? You don't
20 have a job. You've never paid taxes, so where did
21 it come from? That is evidence of money laundering.
22     Q. And that's based upon what?
23     A. Of the Attorney General's office that was
24 helping us at the time.
25     Q. The Attorney General's office didn't

**Page 28**

1 investigate this case, though, did they? You did,
2 right?
3     A. Well, they were part of the team, you could
4 say that.
5     Q. Okay. So what evidence are you aware of
6 that paying cash for a vehicle is evidence of money
7 laundering? What evidence do you know of in the --
8     A. Where did that money come from? You can
9 trace that back to find out where that money came
10 from.
11     Q. Okay.
12     A. Did you work for it? No. Do you pay taxes
13 on it? No. And you never have. That's where it
14 becomes evidence.
15     Q. It becomes evidence of money laundering?
16         THE WITNESS: Do I have to talk to these
17 guys? I don't want to talk to them. I'm done.
18         UNIDENTIFIED MALE: Hang on a second.
19 Preston.
20         Did you have any other information relating
21 to Joe Chavez and selling narcotics in Otero County?
22         THE WITNESS: Yes, I did, a lot.
23         UNIDENTIFIED MALE: Okay. Okay.
24 Explain -- explain that.
25         MR. ORTIZ: Wait a minute. It's my

Page 29

1  interview. I'll ask that question if I get to it.
2    THE WITNESS: Well, I'm telling you I
3  don't --
4    MR. ORTIZ: It's my interview.
5    THE WITNESS: -- I don't have to speak to
6  you.
7    UNIDENTIFIED MALE: All right.
8    THE WITNESS: I don't want to.
9    Q.  (By Mr. Ortiz)  You don't want to -- you
10 don't want to speak to me. You know that you've
11 been listed as a witness in this case, correct?
12   A.  Correct.
13   Q.  You know that --
14   A.  In court I will talk to you.
15   Q.  You know that for a period of time you were
16 the lead investigator on this case. Do you know
17 that?
18   A.  No, I don't know that.
19   Q.  You were never -- you --
20   A.  We -- this was a group effort, a team
21 effort. How I get labeled as the leader, I don't
22 know where you guys come up with that.
23   Q.  Okay. And so you know that prior to your
24 testimony in court, we're allowed to question you,
25 interview you regarding what you know as one of the

Page 30

1  investigators in this case. You're aware of that,
2  right? How long have you been a law enforcement --
3    A.  I don't -- I don't believe I am required to
4  speak to you by law, no.
5    UNIDENTIFIED MALE: Preston, yes. He's
6  entitled to interview you.
7    A.  Well, then let's talk about the case.
8    Q.  (By Mr. Ortiz)  It's my interview and I'll
9  ask the questions that I think are important to this
10 case. And it's your job to answer those questions.
11 You understand that, right?
12   A.  I'll -- sure.
13   Q.  And you understand, as we talked about
14 earlier, that you agree to tell the truth, right?
15   A.  I'll tell you the truth.
16   Q.  Okay. So getting back to this idea about
17 money laundering, what other evidence are you aware
18 of that the purchase of vehicles with cash --
19   A.  I've already answered that question.
20   Q.  -- constitutes money laundering?
21   A.  I've already answered that question.
22 Either move on to another one or wrap it up.
23   Q.  So after you seized the vehicles, did you
24 conduct any further investigation regarding the
25 source of the money used to purchase the vehicles by

Page 31

1  Joe Chavez?
2    A.  We did.
3    Q.  Okay. And what did your investigation lead
4  you to conclude?
5    A.  That he has never had a job. He has never
6  paid taxes. Through the Workforce Solutions we've
7  learned all that.
8    Q.  Okay. And so after you learned that, did
9  you do any other investigation as to where the
10 currency came from to purchase the vehicles that
11 were seized?
12   A.  No. We were buying dope from him. I
13 didn't need -- we know where the money is coming
14 from.
15   Q.  Okay. When you say "we were buying dope,"
16 you mean confidential informants --
17   A.  Confidential informants through our office
18 were buying dope from him, yes.
19   Q.  How many confidential informants were there
20 that were buying narcotics or controlled substances
21 from Joe Chavez?
22   A.  One specifically through me, and that's the
23 one I'll talk about.
24   Q.  That's Sonia Sanders?
25   A.  No.

Page 32

1    Q.  There's another confidential informant?
2    A.  That is correct.
3    Q.  One?
4    A.  One other one.
5    Q.  And Sonia Sanders who said that --
6    A.  She was meaning on them as a second.
7  You're right.
8    Q.  Okay. Is there --
9    A.  But besides Sonia, there is another one.
10   Q.  Is there any other confidential informant
11 that you're aware of that purchased narcotics or
12 controlled substances from Joe Chavez besides the
13 two that we've talked about, Sonia Sanders and this
14 other unnamed confidential informant?
15   A.  Not that I'm aware of. Not through me, no.
16   Q.  And, again, just so that we're clear, this
17 other confidential informant was used to purchase
18 controlled substances from Joe Chavez on how many
19 occasions?
20   A.  A couple.
21   Q.  A couple. And was it during this same time
22 period in which purchases of the controlled
23 substances were made?
24   A.  It was.
25   Q.  And the amounts that were purchased were

**Page 33**

1  recreational amounts?  Am I understanding what you
2  earlier said?
3     A.  Yeah, a gram or two at a time.  And we're
4  not rich.  We don't have unlimited funds.
5     Q.  What moneys are used by the Narcotics Unit
6  to make these confidential informant purchases?
7     A.  We have the Otero County fund and then we
8  have a HIDTA fund, which is federal money.
9     Q.  Okay.  Are any of those funds called a
10  covert fund?
11     A.  Yeah, the sheriff's office fund is.
12     Q.  Okay.  So there's a sheriff's office fund,
13  that's a covert fund, right?
14     A.  Correct.
15     Q.  And then there's a HIDTA fund?
16     A.  Correct.
17     Q.  Okay.  And what moneys were used, as far as
18  you know, to make those purchases?
19     A.  I don't know.  I'd have to go back and look
20  in the books.  It's all logged, but I have no idea
21  what money I used.
22     Q.  Where is it logged?
23     A.  We keep a receipt book to show where
24  every -- where all the money was spent.
25     Q.  Does everyone in the Narcotics Unit have

**Page 34**

1  the authority to requisition or take moneys out of
2  this fund for --
3     A.  Everybody is issued a small amount of money
4  with a receipt book.  And then you document from
5  there where it goes.
6     Q.  Okay.  So when you were in the Narcotics
7  Unit, how much money were you issued?
8     A.  I don't know.  I had covert funds.  I had
9  HIDTA funds.  I had Indian funds.
10     Q.  What is Indian funds?
11     A.  It's money specifically for the
12  reservation.  I don't even know if they have it
13  anymore, but at the time we did.
14     Q.  And each of the agents in the Narcotics
15  Unit are issued a small amount of money that has to
16  be accounted for --
17     A.  Correct.
18     Q.  -- and can be used to give to confidential
19  informants to make purchases of controlled
20  substances?
21     A.  That is correct.
22     Q.  And you used these moneys with this
23  confidential informant, unnamed, to make purchases
24  of controlled substances with Joe Chavez?
25     A.  That is correct.

**Page 35**

1     Q.  Okay.  Recreational amounts?
2     A.  Dope, meth.
3     Q.  Meth, okay.  Any other controlled
4  substances besides methamphetamine?
5     A.  I'm -- not through my informant, no.
6     Q.  Okay.  And did you ever inform or tell your
7  confidential informant to call or to take any action
8  to buy from Joe Chavez?
9     A.  Yeah, he said he buys from him regularly,
10  was dealing for him at one time.  So we set that up
11  to do some controlled purchases.  And then we'd --
12  yeah.
13     Q.  And did you observe those purchases?
14     A.  Not the actual physical transaction, but
15  I've seen the two together and knew that my
16  informant didn't have any dope when he left and
17  brought me dope straight back.
18     Q.  Okay.  So you didn't observe the -- you
19  didn't observe any transaction between your
20  confidential informant and Joe Chavez?  What you
21  observed is you gave your confidential informant
22  money?
23     A.  Checked him, made sure he had no money, no
24  dope on him.  Kept him in physical sight the entire
25  way.  He meets with Joe Chavez and then comes back.

**Page 36**

1     Q.  Okay.
2     A.  No stops along the way, no stops on the way
3  back.  When he shows back up, he hands me the dope.
4  Phone calls were made, you know, telling him it was
5  good stuff, so --
6     Q.  Did you keep a tape -- did you keep a
7  recording of that?
8     A.  We did.  We did.
9     Q.  Did you log that into evidence?
10     A.  It was, yeah.
11     Q.  Was that under a different case?  Was it
12  under a case number that relates to your
13  confidential informant or a case number that relates
14  to Joe Chavez?
15     A.  It could be.  I don't know.  I'd have to go
16  back and look in the file.  I don't remember.
17     Q.  How many tape recordings do you think your
18  confidential informant had with Joe Chavez?
19     A.  I don't remember.
20     Q.  This confidential informant that was used
21  to make purchases with Joe Chavez, did you promise
22  or tell --
23     A.  No, I never promise anything, so --
24     Q.  Was this confidential informant ever
25  charged?

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

Page 37

1  A.  I don't believe he was, no.
2  Q.  Was the confidential informant not charged
3  because he was cooperating with you?
4  A.  Correct.
5  Q.  Was that pursuant to some kind of agreement
6  or some kind of understanding?  How did you make it
7  clear to your confidential informant that you
8  wouldn't charge him if he was --
9  A.  I don't believe I made it clear to him.  I
10  never promise them anything.  They got to do their
11  end of it, so --
12  Q.  They got to do their end of it in order to
13  get something, right?
14  A.  Correct.
15  Q.  And what did your confidential informant,
16  this unnamed confidential informant, get in exchange
17  for working with you to make controlled buys with
18  Joe Chavez?
19  A.  He didn't get charged.
20  Q.  And what did Sonia Sanders get in exchange
21  for assisting you in informing you of the Arizona
22  trip and staying in constant communication with you
23  during the Arizona trip?
24  A.  Death threats.
25  Q.  That's what she got?

Page 38

1  A.  Pretty much.  Her life is definitely no
2  better now than it was then.  In fact, I would say
3  it's a hell of a lot worse.
4  Q.  Did she get any -- did she get anything
5  from the Otero County Sheriff's Department in
6  exchange for the cooperation that she gave you?
7  A.  Protection.
8  Q.  Protection from the death threats?
9  A.  Yeah.
10  Q.  And how would you explain the nature of the
11  protection that Sonia Sanders got --
12  A.  Moved her all over the country.  Sent her
13  out of state.  Kept her in hiding.
14  Q.  Did you perform any of that work to protect
15  Sonia Sanders?
16  A.  Yes, I did.
17  Q.  What steps did you take?
18  A.  I assisted her with getting her airplane
19  tickets and moving her out of the state.
20  Q.  Did you provide her with any money?
21  A.  Sure.
22  Q.  How many airline tickets do you think you
23  yourself helped her get?
24  A.  I don't remember.  One.  I don't know.
25  Q.  All of this assistance that was given to

Page 39

1  Sonia Sanders, that would be recorded in this
2  logbook in the system that you've previously talked
3  about, right?
4  A.  That is correct.
5  Q.  And can you give me an estimate of how much
6  money you think the --
7  A.  No, I cannot.
8  Q.  -- the sheriff's department has spent on
9  Sonia Sanders?
10  A.  No, I can't.
11  Q.  What happened to the vehicles that were
12  seized from Joe Chavez?
13  A.  The federal government has them.
14  Q.  Okay.  Prior to the federal government
15  taking them over from Otero County, what did the
16  sheriff's department do with the vehicles that were
17  seized?
18  A.  We secured them in a locked building.
19  Q.  Where was that locked building?
20  A.  In Otero County at our dispatch center.
21  Q.  Does the Otero County dispatch center have
22  sufficient room to keep and store all --
23  A.  It does.  It used to be a Pepsi plant.
24  There's a very large indoor area.
25  Q.  Okay.  And those are not just the vehicles

Page 40

1  for Joe Chavez, but also the vehicles that were
2  seized from Robert Chavez?
3  A.  All the vehicles seized in the AZ Boys
4  case.
5  Q.  Were kept in the Otero County dispatch
6  center?
7  A.  Yes.
8  Q.  And was there ever a reason for any of
9  those vehicles to ever leave the Otero County
10  dispatch center, as far as you know?
11  A.  Just when the feds came and got them.
12  Q.  Okay.  Who was responsible in the Narcotics
13  Unit for the custody and control of the vehicles
14  that were seized?
15  A.  I don't know of any one person that's
16  responsible for it.
17  Q.  Was it the responsibility of the entire
18  unit or was it the responsibility some departments
19  have --
20  A.  There's a commander.
21  Q.  -- like an evidence custodian?  Who --
22  A.  Yeah, we do have an evidence custodian over
23  there.  That may be his responsibility.  I don't
24  know.
25  Q.  And then some departments have like an

**Page 41**

1  inventory control person. Does Otero County have an
2  inventory person in addition to an evidence
3  custodian, as far as you know?
4      A.  No.
5      Q.  The vehicles that were seized then, were
6  they the responsibility of the evidence custodian
7  because they were evidence of some crime or were
8  they in the control of the Narcotics Unit because
9  they were going to be seized and forfeited assets?
10  Do you know?
11      UNIDENTIFIED MALE:  I think the witness
12  said he didn't know?
13      THE WITNESS:  Yeah.
14      Q.  (By Mr. Ortiz)  Where is Martin Tire in
15  relation to the Otero County dispatch center?
16      A.  It's on White Sands, south of Otero County,
17  yeah.
18      Q.  Okay.  Would there be any reason for one of
19  the vehicles, the black truck, to be at Martin Tire,
20  as far as you know?
21      A.  It seems like they had -- there was a flat
22  tire on the truck or something, so they did take it
23  to get it fixed.
24      Q.  Did you take that tire to get fixed?
25      A.  I don't -- I don't believe I did, no.

**Page 42**

1      Q.  Do you know who took it to get fixed?
2      A.  No.
3      Q.  Was there any other occasion that you can
4  think of in which any of the vehicles that were
5  seized were ever taken out of the Otero County
6  dispatch center besides to go get this tire fixed?
7      A.  No.  No.  And to make it clear, when we
8  seized them at first, we did take them to the
9  Narcotics Unit where we have a fenced yard.  But
10  because the vehicles are very nice, they were moved
11  over to the -- so I guess if you're talking about
12  them being moved, they were moved to the dispatch
13  building where they could be kept inside.
14      Q.  So tell me how you received contact
15  regarding Sammy Mitchell.
16      A.  Another narcotics agent told me about him.
17      Q.  Who was that narcotics agent?
18      A.  David Cunehero.  He was with the city
19  police at the time.  Still is, but he was a
20  narcotics agent with the city police.
21      Q.  What do you remember him telling you?
22      A.  That Mr. Mitchell got caught with like
23  seven pounds of methamphetamines in Arizona and Bob
24  and Angela were following.
25      Q.  And at the time that you were told about

**Page 43**

1  Sammy Mitchell, had you already made contact with
2  Sonia Sanders and --
3      A.  No.  No, it was prior.
4      Q.  Okay.  So then when you made contact with
5  Sonia Sanders, you asked Sonia about Sammy Mitchell,
6  didn't you?
7      A.  Yeah.
8      Q.  What did she tell you about him?
9      A.  I don't remember.  She -- she seemed to
10  know some information how Bob and Angela were
11  keeping money on his books in Arizona.  And, I mean,
12  she knew about him getting caught.
13      Q.  And what statements can you recall that
14  Sonia Sanders made regarding my client Joe Chavez?
15      A.  In --
16      Q.  What did Sonia tell you about Joe Chavez?
17      A.  Lots of stuff.  I don't --
18      Q.  What is it?
19      A.  She was fucking him.  That, you know,
20  they -- those were her statements.
21      Q.  Right.
22      A.  They had sexual relations going on.  She
23  would get dope from him.  She would sell dope for
24  him.
25      Q.  And anything else?

**Page 44**

1      A.  Not that I recall right now.
2      Q.  Is there any document or any report in the
3  file that you can think of that would refresh your
4  recollection on any other statements that Sonia
5  Sanders made regarding Joe Chavez?
6      A.  I'm sure there is.  I wrote a lot of
7  reports in this case, but --
8      Q.  So any documents that you would need to
9  refresh your recollection would be contained in the
10  reports that are filed in this case?
11      A.  Yes.
12      Q.  Anywhere else besides those reports?
13      A.  No, not that I'm aware of.
14      Q.  Okay.  And how many trips were you able to
15  verify that were taken to Arizona for the
16  transportation of controlled substances?
17      A.  Three, I guess.  Two by Sonia and one by
18  Sammy.
19      Q.  And the way that you were to confirm those
20  trips was by your communication with Sonia Sanders?
21  Sonia told you about those trips, right?
22      A.  Well, we went and spoke to Sammy in person
23  too.
24      Q.  Okay.  So Sammy told you about one trip?
25      A.  Correct.

WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE
505-843-7789

Page 45

1    Q.  Sonia told you about two trips?
2    A.  Correct.
3    Q.  And then you observed a fourth trip, right?
4    A.  No, no.  She told us.  I'm only aware of
5  her telling me about one trip.
6    Q.  Okay.
7    A.  And then we observed a second trip.
8    Q.  Okay.
9    A.  So three total.
10   Q.  Three total.  Spoke to Sammy, Sammy's trip.
11  Spoke to Sonia, she took a trip.
12   A.  Yeah.
13   Q.  You observed --
14   A.  And then I had another unnamed confidential
15  informant involved in this that would also make
16  trips.  But I cannot confirm that a trip was ever
17  made by that informant.  I do know that this
18  specific trip involving Sonia was either going to be
19  Sonia or this other informant.  No matter which one
20  it was, we were going.
21   Q.  The same confidential informant that you've
22  used to make controlled purchases; is that right?
23   A.  A confidential informant, yes, sir.
24   Q.  Okay.
25        UNIDENTIFIED MALE:  And how many trips did

Page 46

1  that unnamed confidential informant advise you that
2  he or she went on?
3        THE WITNESS:  Scott, I don't know.  I don't
4  know that they ever did say that.
5        UNIDENTIFIED MALE:  Okay.  Was it your
6  understanding that it was a singular event or
7  multiple events or an unknown number?
8        THE WITNESS:  It's an unknown number.  I
9  don't know that that informant ever did it.  I know
10  that informant was being spoke to by the AZ Boys to
11  do this trip.
12        UNIDENTIFIED MALE:  Okay, thank you.
13   Q.  (By Mr. Ortiz)  So can you tell me what
14  evidence you uncovered in the course of your
15  investigation regarding any criminal activity done
16  by Joe or Bobby Chavez in November or December of
17  2007?
18   A.  You're asking the wrong person that
19  question.
20   Q.  Okay.  Do you know of any evidence that you
21  uncovered in the course of your investigation of
22  criminal activity that occurred by Joe or Bobby
23  Chavez in 2008?
24   A.  I told you my involvement with this case,
25  so prior to 2011 -- well, no, I can't say that.  No,

Page 47

1  I don't.
2    Q.  Okay.  Are you aware of any criminal -- in
3  the course of your investigation, are you aware of
4  criminal activity by Joe or Bobby Chavez in the year
5  2009?
6    A.  Yes.
7    Q.  What is it?
8    A.  I don't believe I can answer that because
9  it's an ongoing investigation.
10   Q.  Is it an ongoing homicide investigation?
11   A.  It's an ongoing investigation.
12   Q.  Is it an ongoing homicide investigation
13  concerning a double homicide that occurred in
14  Alamogordo in 2009?
15   A.  Yeah.
16   Q.  And did you file the report regarding that
17  double homicide?
18   A.  No.  Well, parts of it, yeah.
19   Q.  So I'm showing you an electric copy that
20  was provided in discovery.
21   A.  Uh-huh.
22   Q.  It's a report that's in this case file
23  that's related to a double homicide.  It's a report
24  that you did.
25   A.  Yeah.

Page 48

1    Q.  Do you need to review that report to
2  refresh your recollection?
3    A.  No.
4    Q.  And that report says that it was prepared
5  by you on May 30th of 2012.  Does that seem familiar
6  to you?
7    A.  Probably, yeah.
8    Q.  And this concerns taking of certain blood
9  swabs and photographs?
10   A.  Uh-huh.
11   Q.  You took those?
12   A.  No.  The State Police crime team did.
13   Q.  You assisted the State Police crime lab?
14   A.  No.  I got the search warrant and let them
15  do it.
16   Q.  And you spoke to a Ms. Melissa Evalith?
17   A.  Uh-huh.
18   Q.  Okay.  What do you remember her telling
19  you?
20   A.  That Joe came over to her house the night
21  before -- or the night of this homicide and made her
22  lure one of the victims of the homicide over under
23  the pretenses of sex.  And when he showed up, she
24  went out the back door, told Joe, "He's there," and
25  she left.

Page 49

1        And then Joe paid her money and told her,
2  "Keep your mouth shut or you're next, bitch," and
3  went from there.
4      Q.  And based upon what she told you, what
5  actions did you take?
6      A.  Nothing yet.  I did a search warrant on her
7  house and an interview with her.  And it's still an
8  investigation.
9      Q.  And other than this activity that's
10 contained in your report, are you aware of any other
11 evidence or information regarding any other criminal
12 activity by Joe Chavez in 2009?
13     A.  No, I can't say that I am.
14     Q.  Okay.  Based upon your investigation, are
15 you aware of any criminal activity by Joe or Bobby
16 Chavez in the year 2010?
17     A.  No, I mean, just other than being a police
18 officer here and everybody in town will tell you the
19 AZ Boys sells dope.  So we knew who to watch for,
20 but --
21     UNIDENTIFIED MALE:  Are you aware of a
22 criminal history of either Joe or Bob Chavez?
23     THE WITNESS:  Yeah, at the time we started
24 this -- while I was in the narcotics, yes.
25     UNIDENTIFIED MALE:  Okay.  So in terms of

Page 50

1  answering questions regarding any prior convictions
2  of jail time or penitentiary time --
3      THE WITNESS:  Right.
4      UNIDENTIFIED MALE:  -- were you aware that
5  Joe and Bob Chavez had been convicted of crimes
6  previously?
7      THE WITNESS:  Correct.  Yes, I was.
8      UNIDENTIFIED MALE:  Okay.  So in terms of
9  answering the questions regarding knowledge of
10 previous criminal wrongdoings, were you including
11 that or not including that in your answer?
12     THE WITNESS:  I was not including that, no.
13     UNIDENTIFIED MALE:  Okay.  So --
14     Q.  (By Mr. Ortiz)  Are you aware that -- are
15 you aware of any convictions of any criminal
16 activities for Joe Chavez in the years 2007, 2008,
17 2009, 2010 or --
18     A.  I don't know what year they were convicted.
19 But, yes, I looked at their (inaudible) law and saw
20 they were convicted of violent felonies, yes.
21     Q.  And that was prior to 2007, wasn't it?
22     A.  I don't know.
23     Q.  That was before they came to New Mexico,
24 wasn't it?
25     A.  I don't know.

Page 51

1      Q.  Are you aware of any state charges filed
2  against Joe or Bobby Chavez in New Mexico?
3      A.  No, I'm not.
4      Q.  Except for the charges that they're --
5      A.  Pending.
6      Q.  Right.
7      A.  Yes.
8      Q.  Okay.  So I want to show you the report and
9  then I want to ask you questions about a second
10 report because it looks like the typing is
11 different.  So I'm going to approach you.  This is
12 the report that you did on the double homicide.  You
13 see that?
14     A.  Uh-huh.
15     Q.  Okay.  So this is the first page of the
16 report.
17     A.  Okay.
18     Q.  And then it goes through and then you see
19 there's a second page.  And it looks like the type
20 is the same, doesn't it?  It looks like the font and
21 the type is the same?  And then there's page 3, and
22 then it's the same.  And then there's page 4, and it
23 looks like it's the same.  And then there's your
24 signature with the date.
25     A.  Correct.

Page 52

1      Q.  That's the standard report that's used --
2  that was used in the narcotics agency, wasn't it?
3      A.  Yeah.
4      Q.  Okay.
5      A.  It looks normal.
6      Q.  I'm going to show you a report that you
7  filed after the indictments.  It says it was
8  prepared on August the 6th.
9      A.  Okay.
10     Q.  It's regarding racketeering.  Do you see
11 that?
12     A.  Uh-huh.
13     Q.  The date, time, and a place, that looks
14 like an errata, doesn't it?
15     A.  It looks like a what?
16     Q.  Like an errata, like an error.  You see the
17 date that it was prepared.  It says August 6th,
18 2012.  And then when it says date, time, and place,
19 it says --
20     A.  Oh, yeah.
21     Q.  -- October 24th, 2011, approximately four
22 hours at USBP checkpoint.
23     A.  I don't --
24     Q.  That looks like -- you know, like a form
25 that you use and you just --

Page 53

1    A. I don't know. I'd have to see what the
2  report says to --
3    Q. Okay.
4    A. Because that could be referring to the --
5    Q. Okay. So then the second page, you see how
6  the font and the type is one way?
7    A. Uh-huh.
8    Q. And then it switches.
9    A. Yeah.
10    Q. And there's not a page to designate up at
11  the top. And it shows different typing. And then
12  it shows your signature with a date of August the
13  8th of 2012.
14    A. Uh-huh.
15    Q. So it leaves me to believe that August 8th,
16  2012, comes closer to this date that's up here at
17  the top, August the 6th, than it does to
18  October 24th, 2011.
19    A. I don't know. I didn't get to read the
20  body of the report.
21    Q. Oh.
22    A. So does it talk about a crime that occurred
23  on that date and time?
24    Q. No, it doesn't actually.
25    A. Oh, okay. Then it probably is a typo.

Page 54

1    Q. If you want to go ahead and read it, you
2  can. This is an unlabeled page 2 of this report.
3    A. Uh-huh. Okay.
4    Q. So can you explain the difference in time
5  and font?
6    A. No. Probably just a typo as the top one
7  was.
8    Q. And as you read page 2, there's nothing in
9  page 2 that relates at all to a date October 24,
10  2011 --
11    A. No.
12    Q. -- is there?
13    A. I know what that was, is the attorney with
14  the Attorney General's office was asking for just a
15  brief report based on the -- you know, just an
16  overall of what I did.
17    Q. Okay.
18    A. That was at the time I was coming out of
19  the Narcotics Unit.
20    Q. Okay. And so that October 24th date,
21  that --
22    A. That has nothing to do with this.
23    Q. With that, okay. And you're saying that
24  this report -- you were directed to do a report like
25  this by the Attorney General's office?

Page 55

1    A. Yeah. Just a brief overview of what
2  happened.
3    Q. Okay. And that was -- August of 2012 was
4  approximately three months after the grand jury,
5  right?
6    A. Was it? Yeah.
7    Q. Okay. And this was around the time that
8  you were transitioning out of the unit?
9    A. Correct.
10    Q. Okay. Thank you for that. So in terms of
11  the investigation that you conducted regarding money
12  laundering, were you able to uncover evidence of
13  money laundering on or about March 11th, 2010?
14    A. I wasn't working this case on March 11th of
15  2010.
16    Q. Okay. Were you able to uncover any
17  evidence in the course of your investigation
18  regarding money laundering on or around January 15th
19  of 2011?
20    A. I don't know what you're talking about. I
21  mean, their documents could have been dated back
22  then. I don't know.
23    Q. Okay. Did you see any documents that were
24  dated on or around March 11th, 2010, that relate to
25  money laundering, as best you can remember?

Page 56

1    A. I saw a lot of documents in this case.
2    Q. Right.
3    A. And there was an agent in the unit that was
4  handling that part of it, so --
5    Q. And who was that agent who was handling the
6  documents?
7    A. That was Flores.
8    Q. Dustin Flores?
9    A. Yeah. So you're going to have to ask him
10  those, not me.
11    Q. Was he the primary agent within the unit
12  that was responsible for conducting the review of
13  the documents that related to money laundering in
14  this case?
15    A. He was. He was, and there was another guy.
16    THE WITNESS: Where was he from? The guy
17  from out of -- was he with the IRS or -- the IRS
18  investigator that was over there for months going
19  through all the documents? I don't remember.
20    UNIDENTIFIED MALE: In the January/February
21  timeframe?
22    THE WITNESS: I don't remember when he was
23  there, but there was an IRS agent.
24    UNIDENTIFIED MALE: Yeah, there was a
25  forensic accountant that was there for a while.

**WILLIAMS & ASSOCIATES – COURT REPORTING SERVICE**
505-843-7789

**Page 57**

1    THE WITNESS: There you go.
2    MR. BUTLER: Loginski. Does that name
3  sound familiar?
4    UNIDENTIFIED MALE: Yeah, I think -- I
5  think that's his name.
6    THE WITNESS: I couldn't tell you his name.
7    Q. (By Mr. Ortiz) Okay. So with respect to
8  the documents, the documents that relate to money
9  laundering, you didn't have primary interaction with
10  those documents; is that right?
11    A. No. No. Correct.
12    Q. Okay. It was Dustin Flores who was
13  responsible for doing the document review?
14    A. Right.
15    Q. Although, just to be clear, I'm not going
16  to misstate your testimony, you did review a lot of
17  documents --
18    A. Sure.
19    Q. -- you weren't charged with the primary
20  responsibility of developing the evidence for --
21    A. Yeah, there was documents for years and
22  years. I'm not going to sit here and tell you did I
23  see one with that date on it. I don't know.
24    Q. Okay.
25    A. And you know that, so --

**Page 58**

1    Q. You may have seen it.
2    A. I may have. I may not. I don't know.
3    Q. But in terms of developing evidence from
4  those documents, that was Dustin Flores's
5  responsibility?
6    A. Correct.
7    Q. Did Sonia Sanders ever admit or tell you
8  that she received money from Joe Chavez to purchase
9  controlled substances?
10    A. I don't remember if she did or not. She
11  may have. I don't know.
12    MR. ORTIZ: Those are all the questions
13  I've got at this time.
14    EXAMINATION
15  BY MR. BUTLER:
16    Q. I have a few quick ones for you. My name
17  is Justin Butler. I'm an investigator representing
18  Bobby Chavez.
19    What first led you to investigate Robert
20  Chavez? Back in the very beginning when the
21  investigation was just starting, what was the first
22  tip that you got that led you to open the
23  investigation?
24    A. Sonia Sanders opened it.
25    Q. Through her testimony to you?

**Page 59**

1    A. Through what?
2    Q. Through what she told you?
3    A. Well, this is a very small community.
4  There was -- everybody around knew that these guys
5  deal dope. We know these guys are the biggest ones
6  here. But, yes, she's the one that assisted with
7  opening this case.
8    Q. And you were present on the road trip to
9  Arizona to surveil the Phoenix residence, correct?
10    A. Yes, I was.
11    Q. When you got to Phoenix, from where did you
12  surveil the residence? Where is the location in
13  relation to it?
14    A. It was on West Hilton, which is right off
15  the interstate. So we would either drive on Hilton
16  or we would drive on the interstate and just drive
17  around the place.
18    Q. And were photographs taken of that
19  residence?
20    A. Yes, they were.
21    Q. Do you know where those photographs would
22  be now?
23    A. In the evidence.
24    Q. While you were there, did you ever see
25  Robert Chavez at the residence?

**Page 60**

1    A. No, I can't say that I physically saw him
2  at the house, no.
3    Q. Did you see Angela Catt at the residence?
4    A. No. I saw their vehicle there and knew
5  that had left at one time to get over to the tire
6  shop to get a spare tire. They didn't have a spare
7  for the truck.
8    Q. And how did you know that?
9    A. Through Sonia. Sonia told us.
10    Q. Did you see anybody else on the premises?
11    A. No.
12    Q. Okay. Outside of what Ms. Sanders told
13  you, did you have any firsthand knowledge of seeing
14  Robert Chavez do anything illegal in that trip prior
15  to his arrival back in Alamogordo?
16    A. No. Just followed her back with four
17  pounds all the way and avoided every checkpoint
18  along the way.
19    Q. Are the checkpoints well known in the
20  community, what roads are normally surveilled by the
21  border patrol?
22    A. Absolutely.
23    Q. So when they got back to Alamogordo and
24  they switched cars --
25    A. Uh-huh.

Page 61

1    Q.  -- did you see the car switch actually
2  happen?
3    A.  Yes.
4    Q.  How far away were you?
5    A.  Relatively close.  Close enough to see the
6  vehicles -- drivers of the vehicle switch.
7    Q.  Do you have a yard estimate, maybe?
8    A.  No.
9    Q.  Okay.  Where did the switch take place?
10    A.  At the intersection of Eagle and Hamilton.
11    Q.  Eagle and Hamilton.  Is that a well lit
12  intersection?
13    A.  Not really, but I guess there's lights
14  there.  It's a residential area.
15    Q.  What time of day did this car switch
16  happen?
17    A.  Very early in the morning.
18    Q.  Very early.
19    A.  Still dark.
20    Q.  Still dark.  Did you have any visual aids
21  to help you surveil the --
22    A.  We had binoculars.
23    Q.  Binoculars.  How many people in the car
24  with you?
25    A.  Two others.

Page 62

1    Q.  How many pairs of binoculars did you have?
2    A.  I don't recall.
3    Q.  Were you sharing one pair?
4    A.  I don't know, man.
5    Q.  Were you looking through -- okay.
6    THE WITNESS:  Tell him I don't know.
7    UNIDENTIFIED MALE:  Just listen to his
8  question.
9    Q.  (By Mr. Butler) I'm getting to it.  I
10  swear.  I swear.  Do you remember looking through
11  the binoculars?
12    A.  I do remember looking through binoculars.
13    Q.  During the car switch?
14    A.  Correct.
15    Q.  Okay.  Do you remember what they were
16  wearing, perhaps?
17    A.  No.
18    Q.  Did you take any photographs of the car
19  switch?
20    A.  No.
21    Q.  Okay.
22    A.  Big flash might give away that the cops are
23  sitting right there.
24    Q.  Possibly.  Did you prepare any warrants as
25  part of this case against Bob Chavez?

Page 63

1    A.  I don't remember.  Not the initial warrant.
2  I had it.  I was on the phone with the agency or --
3  telling them what to write up.
4    Q.  And that goes for the truck -- was that the
5  truck or the house?
6    A.  That was for the truck.
7    Q.  For the truck.  And then for the house, do
8  you recall being part of the warrant preparation for
9  that?
10    A.  No.  Neil wrote that warrant.
11    Q.  Okay.  Were you present when Bob was
12  arrested?
13    A.  I was.
14    Q.  Can you explain how that arrest happened?
15    A.  Yeah.
16    Q.  Just what you remember seeing.
17    A.  I walked up, grabbed ahold of him, put
18  handcuffs on him, and walked him away and put him in
19  a car.
20    Q.  And why did you arrest Bob at that point in
21  time?
22    A.  Because we knew he had just hauled four
23  pounds of meth back to Alamogordo.
24    Q.  Where was the truck parked?
25    A.  In the street in front of the house.

Page 64

1    Q.  Did you see Bob exit the house?
2    A.  I didn't, but he was standing in the
3  driveway and he threw the keys to the truck in the
4  back of another truck.
5    Q.  And did you see him do this?
6    A.  No.  It was yelled to me.  Other agents --
7  somebody saw him do it.
8    Q.  Do you recall who that was?
9    A.  No.  There was a lot of agents there.
10    Q.  Did you find the keys in the back of the
11  truck?
12    A.  I don't remember if I found them.  But they
13  were found there, yes.
14    Q.  They were found, okay.  Do you recall --
15  how many cars were in the driveway and garage of
16  Bob's residence at the time?
17    A.  Two or three.  There was others on the
18  street as well.
19    Q.  Do you remember afterwards, were they all
20  operational at that point in time?
21    A.  I believe they were, yeah.
22    Q.  Okay.  Have you ever spoken to Bob Chavez?
23    A.  Very briefly.
24    Q.  When?  When did that happen?
25    A.  That morning.  He told us he didn't want to

Page 65

1    talk without an attorney.  And then I think he cried
2    a little and told me not to shoot his dog.
3       Q.   Was that while you were arresting him on
4    premise at the residence?
5       A.   And while they were seizing their house.
6       Q.   Okay.
7       A.   I think I was being a smart ass to him and
8    told him, "I'm going to shoot your dog," but --
9       Q.   Did you speak to him after you placed him
10   under arrest?
11      A.   No.
12      Q.   Okay.  What happened after you arrested
13   him?  Did you drive him to the station?
14      A.   We took him to the station, tried to
15   interview him.  He did not want to speak, so we just
16   booked him into the jail.
17      Q.   Have you ever spoken to Tracy Garrison?
18      A.   Yes.
19      Q.   In what context?
20      A.   They -- they did several interviews with
21   her.  I don't -- I don't remember if I ever
22   interviewed her, or -- I may have.  I don't know.
23      Q.   Do you remember -- you can't remember
24   interviewing her though?
25      A.   I don't remember me interviewing her, but

Page 66

1    that doesn't mean I didn't.
2       Q.   You were present for some interviews
3    though?
4       A.   I was, yeah.
5       Q.   What do you recall Tracy Garrison
6    explaining during those interviews?
7       A.   I don't recall right now.  I'd have to go
8    back and look at all the reports.  I remember most
9    of the time she just played stupid, like "I don't
10   know what's going on.  I don't know what's going on.
11   We live together but he stays on his side of the
12   house.  I stay on my side of the house," stuff like
13   that.
14      Q.   Did she ever admit to any illegal activity
15   happening in the house?
16      A.   Not that I recall.  I know her involvement
17   was (inaudible).  You know, she'd go buy the
18   vehicles and let the vehicles be put into her name.
19      Q.   Do you know Curtis Mattson?
20      A.   I do.
21      Q.   And how?  How do you know Curtis Mattson?
22      A.   He was somebody selling dope for her.  He
23   was part of the DTO.
24      Q.   Have you ever spoke to Curtis Mattson?
25      A.   Briefly.

Page 67

1       Q.   What did that conversation consist of?
2       A.   I don't know.  I told him I know he's
3    dealing dope.
4       Q.   And how did he respond to that?
5       A.   I don't know, man.
6       Q.   Okay.  Do you remember when this
7    conversation took place?
8       A.   No, I don't.
9       Q.   What do you know about Curtis Mattson
10   outside of that conversation with him?
11      A.   I don't.  I know he's part of the AZ Boys
12   DTO, drug trafficking organization.  I don't know.
13      Q.   Have you ever investigated him or his
14   finances?
15      A.   Not his finances, no.  We tried to catch
16   him several times.
17      Q.   Not successfully though?
18      A.   I caught him once.
19      Q.   And what happened after you caught him?
20   Was he arrested?
21      A.   No.
22      Q.   Why not?
23      A.   He just wasn't arrested.
24      Q.   Has he actually ever been in trouble with
25   your department?  Has he been arrested in the past?

Page 68

1       A.   I don't know.
2       Q.   Is he or has he ever been a drug user?
3       A.   I don't know.
4       Q.   Do you recall the time that you had a
5    run-in with him what he had on him that was illegal
6    at the time?
7       A.   I think it was meth.
8       Q.   Do you remember how much?
9       A.   No.
10      Q.   And do you have a reason you didn't arrest
11   him at that point in time?
12      A.   Yeah.
13      Q.   What was your reason?
14      A.   Maybe he wanted to work.
15      Q.   Wanted to work off the charge possibly?
16      A.   Yep.
17      Q.   Uh-huh.  How long did he work for you?
18      A.   I don't know.
19      Q.   Is he still working for the sheriff's
20   department?
21      A.   I have no idea.
22      Q.   Were you involved with Curtis Mattson ever
23   having a controlled buy from either Bob or -- Bob or
24   Joe --
25           UNIDENTIFIED MALE:  Don't answer any

**Page 69**

1    /questions about Robert --
2        A.  I'm not going to answer.
3        MR. BUTLER:  I'll just wait to talk to him.
4        UNIDENTIFIED MALE:  Do you have any
5    questions, ma'am?
6        MS. RICE:  I'm not familiar with this case.
7    Originally the attorney was going to be here, but he
8    had to cover prelims today, so I'm here on behalf of
9    Michael Keedy.  He is representing Tracy Garrison in
10   this case.
11       THE WITNESS:  Okay.
12                EXAMINATION
13   BY MS. RICE:
14       Q.  And if you know anything about her
15   involvement and if you could obviously relay that?
16       A.  I do, but that would be very -- I mean, if
17   you have a specific question, I'll answer it.
18   Otherwise, Michael has my phone number. He's
19   welcome to call me.
20       Q.  Okay. Did she admit to anything other
21   than -- I know you said she played stupid. I
22   thought I heard you say Tracy admitted to purchasing
23   vehicles.
24       A.  Yeah, she was buying vehicles.
25       Q.  She admitted to purchasing --

**Page 70**

1        A.  And they were putting them in her name.
2        Q.  Okay. And she admitted to purchasing those
3    with cash?
4        A.  Yes.
5        Q.  Okay. And did she say they were for her or
6    for them?
7        A.  I don't -- I don't remember what she said,
8    but we know who they were for. They're driving
9    them. They're in her name.
10       Q.  Okay.
11       A.  She lives with Joe Chavez.
12              FURTHER EXAMINATION
13   BY MR. ORTIZ:
14       Q.  She's got two young children with Joe
15   Chavez, right?
16       A.  She does, yes.
17       Q.  As far as you know. is there anything
18   illegal about letting the mother of your children
19   have cars in her name?
20       A.  No. But again. it all falls back to she
21   doesn't work either. She's never paid taxes either.
22   We got those records from the Workforce Solutions as
23   well. so --
24       Q.  So the basis of the illegal activity is
25   that you can't find whether they work or pay taxes,

**Page 71**

1    but they have cash and they buy vehicles with cash.
2        Q.  That's evidence of illegal activity, in your mind;
3    is that right?
4        A.  It is, yes.
5        Q.  Is there any other evidence that you know
6    of in the course of your investigation that supports
7    that contention that that activity is illegal?
8        A.  I don't understand what you're saying.
9        Q.  Do you know of any other evidence besides
10   the facts that you've just given me that there's
11   illegal activity going on between Joe Chavez and
12   Tracy Garrison purchasing cars in cash?
13       A.  No. I mean, they can't show where the
14   money came from, so --
15       MS. RICE:  That's all.
16                EXAMINATION
17   BY MR. WELLS:
18       Q.  When you guys were in Arizona, did you see
19   any other vehicles come in other than --
20       A.  No.
21       Q.  -- the truck and the SUV?
22       A.  No.
23       Q.  And then I just got a couple. I don't know
24   that we've asked this yet, but during the switch did
25   you identify who the people were getting out?

**Page 72**

1        A.  Yeah.
2        Q.  Who were they?
3        A.  Sonia Sanders and Bob Chavez.
4        Q.  Okay. Did you see anybody else in the
5    other vehicles?
6        A.  No. Angela Catt was in the other vehicle,
7    but she jumped over the center console. She didn't
8    get out of the --
9        Q.  She was in the black --
10       A.  She was in the black SUV.
11       Q.  Okay.
12       A.  In the passenger side, but she didn't get
13   out.
14       Q.  So what happened with Sonia after the
15   switch? Was she tailed to wherever she was dropped
16   off?
17       A.  She was.
18       Q.  Where was --
19       A.  Well, I don't know if she was tailed. But
20   we had people in her house already because we knew
21   that they would take her home.
22       Q.  So is that where she was taken?
23       A.  Yeah.
24       Q.  Who was at her house?
25       A.  Narcotics agents. I don't remember who --

**Page 73**

1 which ones they were. I think Dustin may have been
2 one of them, but I don't know.
3    Q. Dustin, which one is that?
4    A. Flores.
5      MR. WELLS: Flores. He's the guy that was
6 30, 40 minutes behind them yesterday, huh? Yeah.
7    Q. (By Mr. Wells) Did you document how
8 long -- what time it was when the switch was and did
9 he document what time she got home?
10    A. I don't know what he did, so don't ask me
11 what he did. There is a report on the switch of the
12 vehicles.
13    Q. Okay.
14    A. It does have a date and time in there,
15 so --
16    Q. If it wasn't Flores, who else involved
17 might have been there? Anybody with the sheriff's
18 office?
19    A. Yeah.
20    Q. Yeah.
21    A. But I don't know. It could have -- there
22 could have been HSI and border patrol agents there
23 too. I don't know. We had a lot of people helping.
24    Q. Okay. Now, all this communication between
25 you and her -- and how do you say her name, Sonia or

**Page 74**

1 Sanya?
2    A. Sonia is what I say.
3    Q. Sonia. All this communication between you
4 and her, were those recorded --
5    A. No.
6    Q. -- those calls by you?
7    A. No.
8    Q. Now, your texts, did you take pictures of
9 those and --
10    A. No.
11    Q. -- disclose any of that? Did she?
12    A. I don't know.
13    Q. Now, this tire that they go get in Arizona,
14 it was a spare for the white pickup; is that right?
15    A. It did not fit that white pickup.
16    Q. Yeah, that was my question.
17    A. It was not the right size.
18    Q. Because in the report I think you made a
19 note of that. And when you guys retrieved the tire
20 it was underneath the vehicle or in the bed?
21    A. Uh-huh. It was under the vehicle.
22    Q. Okay. And when they did this switch, one
23 of the other officers said yesterday they're not
24 positioned like this, they're positioned both
25 vehicles pointing the same direction, one behind the

**Page 75**

1 other; is that correct?
2    A. Yeah. It seems like it, yeah.
3    Q. Were you on the driver's side of those
4 vehicles or the passenger side?
5    A. I was on the driver's side of those
6 vehicles.
7    Q. So you would have been on the west side of
8 the road?
9    A. Correct.
10    Q. Okay. South of Martin Luther King or
11 north?
12    A. I don't know from Martin Luther King, but I
13 was south of Eagle Drive, I know that.
14    Q. Can you mark on there for me?
15    A. Where I was at?
16    Q. Yeah.
17    A. Yeah.
18    Q. That's -- I'm not good at that kind of
19 stuff, but these are about the best pictures I could
20 get.
21    A. Yeah, I don't know. I was over here
22 somewhere.
23    Q. Which is -- which would be on the east side
24 of Hamilton?
25    A. No. I was on the west side of Hamilton.

**Page 76**

1 This is north.
2    Q. Up is north.
3    A. This is north.
4    Q. Right.
5    A. So this is west over here. I'm on the west
6 side of Hamilton, south of the intersection where
7 the -- here's the intersection where they exchanged,
8 and I was over here somewhere.
9    Q. Oh, I thought the exchange was at the
10 intersection of Martin Luther King and Hamilton.
11    A. No, it was right there.
12    Q. Which you're indicating -- what's that,
13 Eagle?
14    A. That's Eagle and Hamilton.
15    Q. Okay. I'm sorry, tell me again where you
16 were. Further south?
17    A. Further south. There's a desert area right
18 here. We were just pulled off in the dark. We were
19 in a black car.
20    Q. Where were the other officers, do you know?
21    A. Hell if I know. I just sat for a week in
22 federal court trying to explain that. I don't know.
23    Q. Okay. Yeah, and I think there are
24 streetlights I saw in one of these closer ones.
25    A. Oh, there were streetlights.

**Page 77**

1    Q.  Did you ever talk to Angela?  Did you ever
2  do any interviews with her?
3    A.  We tried, but no.  I don't know that I ever
4  did one.  I don't know.  I'd have to go back and
5  look.
6    Q.  Sure.  Now, you didn't -- you said you
7  didn't have any texts, recording, or anything like
8  that.  There's evidence in this federal trial that
9  you guys recorded them or -- I don't know where it
10  came from, but was she recorded?
11    A.  Recorded who?
12    Q.  Sonia.  During the trip was she -- was she
13  wired?
14    A.  No.  But on the trip up, we stopped, and
15  she would call Bob, you know.  And we recorded
16  those --
17    Q.  I gotcha --
18    A.  -- those conversations.
19    Q.  Was there any drug conversations I
20  haven't --
21    A.  No.  Most of that was just, "I'm on my
22  way."
23    Q.  Okay.
24    A.  You know, the -- he would give her
25  directions and stuff like that.

**Page 78**

1    Q.  So she wasn't wired?
2    A.  No, no.
3    Q.  And the vehicles weren't -- you didn't have
4  a tracer on them or anything?
5    A.  No.
6    MR. WELLS:  Okay.  Man, I think that's all
7  we got.
8        FURTHER EXAMINATION
9  BY MR. ORTIZ:
10    Q.  A couple of follow-up questions, Deputy.
11  Did you ever have any interviews or contacts with
12  Joe Chavez?
13    A.  When I arrested him.
14    Q.  What do you remember him telling you?
15    A.  Nothing.  He didn't say anything.  I just
16  told him, "This is not just a search warrant.  We do
17  have a warrant for your arrest."  I put his --
18  helped put his clothes on because he was naked.
19    Q.  And the arrest was for money laundering,
20  right?
21    A.  At that time, yes.
22    Q.  Okay.  And as far as you know, when did
23  this designation that you talked about, AZ Boys DTO
24  or drug trafficking organization -- who came up with
25  that name?

**Page 79**

1    A.  Well, they're known as the AZ Boys.
2    Q.  Right.
3    A.  They're known all over the streets here as
4  the AZ Boys.  I know that the Otero County Narcotics
5  Enforcement Unit labeled them as a DTO back in the
6  '08/'09 timeframe, so --
7    Q.  And you knew that because when you came
8  into the unit they told you that, that it was a DTO,
9  drug trafficking organization?  How did you know
10  that?
11    A.  Because, yeah, I learned it.  I don't know
12  how I knew it, but I learned it.
13    Q.  The currency that was taken from Joe
14  Chavez's house, was any forensic evaluation done on
15  that currency?  Was it ever tested for fingerprints
16  or tested for controlled substances?
17    A.  It was in his underwear drawer.  Why would
18  we test it?
19    Q.  The same question goes for the currency
20  that was taken from Robert Chavez's house.  Was
21  there any forensic evaluation done of that currency?
22    A.  Again, it was taken out of his house.
23    Q.  Was it take --
24    A.  And off of his person.  And it wasn't very
25  much money, so I don't know.

**Page 80**

1    Q.  Was it tested for controlled substances or
2  for fingerprints or anything like that?
3    A.  Not that I know of, no.
4    Q.  Okay.
5        FURTHER EXAMINATION
6  BY MR. BUTLER:
7    Q.  Did you have an arrest warrant for Robert
8  Chavez?
9    A.  No.  You mean at the time we --
10    Q.  At the time you arrested him.
11    A.  No.
12        FURTHER EXAMINATION
13  BY MR. ORTIZ:
14    Q.  Just to close, have you ever been the
15  subject of an Internal Affairs investigation?
16    A.  No.
17    Q.  Have you ever been subject to disciplinary
18  action?
19    A.  No.  Well, I don't know.  Wait a minute.  I
20  was just recently in an officer-involved shooting,
21  so I don't know if they did an IA on that or not.  I
22  know the State Police did an investigation and
23  cleared it, but I don't know if they did an IA.  So
24  if they did an IA, then yes.  But I don't think they
25  did.

Page 81

1    Q.  Okay.
2         EXAMINATION
3    BY MR. WELLS:
4    Q.  And the last one.  I asked you about Sonia.
5    Was Angela tracked at all?  Do you know where she
6    went after she dropped her off?
7    A.  After she dropped —
8    Q.  Right.
9    A.  — Sonia off?  No, I don't.
10   Q.  Okay.  Because she shows back at the house.
11   A.  She comes back over there claiming, "Oh, I
12   don't know what's going on.  I've been at my mom's
13   house sleeping all night."
14   Q.  Right.
15   A.  "Bullshit, I just followed you from
16   Phoenix."
17        "Oh, really?"
18   Q.  What's the timeframe between the vehicle
19   switch and when she shows back up to the house?  Can
20   you give an estimate?
21   A.  No.  It wasn't real long.  I mean, I don't
22   know.
23   Q.  How come you guys didn't arrest her right
24   there?
25   A.  We should have.  We just let her walk — I

Page 82

1    told her, "You know what, you're free to go at this
2    time.  We have so much other stuff going," I told
3    her, "you're free to go at this time but you cannot
4    take that vehicle," and we seized the vehicle.
5    Q.  So she took off jogging?
6    A.  She took off walking.
7    Q.  All right.
8         FURTHER EXAMINATION
9    BY MR. BUTLER:
10   Q.  And were the kids with her at that time?
11   A.  No, there was no kids with her.  There was
12   two kids in the house, and I think they may have
13   left with her.
14   Q.  Okay.
15   A.  But when she showed up she was alone,
16   driving the same vehicle that she had just come back
17   from Arizona in.
18        MR. WELLS:  That's it.
19        MR. ORTIZ:  Those are all the questions
20   I've got.
21        THE WITNESS:  Okay.
22        MR. ORTIZ:  Thank you for your time.
23        MR. BUTLER:  Thank you, sir.
24        [The recording concludes.]
25

Page 83

1    In Re:
2    Preston Eldridge Interview
3
4
5
         C E R T I F I C A T E
6
7
     I, Lisa Reinicke, New Mexico Certified
8    Stenotranscriptionist, DO HEREBY CERTIFY that the
     above captioned transcription was prepared by me;
9    that the RECORDING was reduced to typewritten
     transcript by me; that I listened to the entire
10   RECORDING; that the foregoing transcript is a
     complete record of all material included thereon,
11   and that the foregoing pages are a true and correct
     transcription of the recorded proceedings, to the
12   best of my knowledge and hearing ability.  The
     recording was of GOOD quality.
13
     I FURTHER CERTIFY that I am neither employed
14   by nor related to nor contracted with (unless
     excepted by the rules) any of the parties or
15   attorneys in this matter, and that I have no
     interest whatsoever in the final disposition of this
16   matter.
17
18
19
20
21
22        _____
          Lisa Reinicke,
          Certified Stenotranscriptionist
23
24
25

IN THE SUPREME COURT

OF THE STATE OF NEW MEXICO

STATE OF NEW MEXICO,

          Plaintiff-Appellee,

vs.                                                            S-1-SC-37067

JOE DAVID CHAVEZ, SR.,

          Defendant-Appellant.


# APPELLANT'S BRIEF IN CHIEF


Appeal from the District Court for Otero County
Hon. Jerry H. Ritter, Presiding


Submitted by:

Jeffrey J. Buckels, Esq.
2410 Venetian Way SW
Albuquerque NM 87105
(505) 363-4609

Attorney for Appellant

December 10, 2018


*Oral Argument Requested*

65,

# TABLE OF CONTENTS

TABLE OF AUTHORITIES                                                    iv

STATEMENT OF THE CASE                                                    1

ARGUMENT                                                                13

## I.

THE EVIDENCE ACTUALLY ADDUCED AT TRIAL OF A LINK
BETWEEN THE INTERESTS OF THE DTO AND THE KILLING OF
VALDEZ FELL FAR SHORT OF THE STATE'S PRETRIAL PROFFER,
SO THAT THE TRIAL COURT'S ADMISSION OF THE
"ASSOCIATION" EVIDENCE WAS BASED ON A GROSS
OVERESTIMATE OF THE PROBATIVE VALUE OF THE DTO
EVIDENCE, WHILE ITS UNAFAIR PREJUDICE TO MR. CHAVEZ
REMAINED EXTREME.                                                       13

## II.

THE STATE SHOULD NOT HAVE BEEN PEMITTED TO CALL JUDE
SANCHEZ TO TESTIFY CONCERNING HIS PRISON
CONVERSATION WITH MATIAS LOZA AS A STATEMENT
AGAINST INTEREST BECAUSE THE PROSECUTION DID NOT
ESTABLISH LOZA'S UNAVAILABILITY.                                        19

## III.

THE COURT PERMITTED THE STATE TO ADDUCE HIGHLY
PREJUDICIAL EVIDENCE THAT MR. CHAVEZ WAS A "WIFE-
BEATER" IN THE ABSENCE OF ANY NON-PROPENSITY PURPOSE
TO THE EVIDENCE.                                                        27

## IV.

THE PROSECUTION MADE CRITICAL, MISLEADING
REPRESENTATIONS PRIOR TO TRIAL CONCERNING THE NATURE
OF THE LOZA RECORDINGS, WHICH MISREPRESENTATIONS

66.

WERE NOT CORRECTED TILL MID-TRIAL, AND WHICH MISLED
COURT AND COUNSEL AND AFFECTED DEFENSE STRATEGY.

28


**V.**


THE MULTIPLE ERRORS COMPLAINTED OF IN THIS APPEAL
AMOUNTED TO REVERSIBLE CUMULATIVE ERROR NOT ONLY
BECAUSE OF THE NUMBER OF ERROS BUT ALSO BECAUSE OF
THE WAY THE ERRORS INTERTWINED TO DEPRIVE MR. CHAVEZ
OF A FAIR TRIAL.

30


CONCLUSION AND PRAYER FOR RELIEF                                    31

REQUEST FOR ORAL ARGUMENT                                           32

CERTIFICATE OF SERVICE                                             32

67.

# TABLE OF AUTHORITIES

### New Mexico Cases

*State v. Aguayo*, 1992-NMCA-044, 114 N.M. 124.                    14, 16, 18

*State v. Barley*, 81 S.E.2d 772 (N.C. 1954).                    21

*State v. Barrera*, 2001-NMSC-014, 130 N.M. 227.                    27

*State v. Begay*, 1998-NMSC-29, 125 N.M. 541.                    27

*State v. Davis*, 1978-NMCA-122, 92 N.M. 342.                    17

*State v. Fuson*, 1978-NMCA-2, 91 N.M. 366                    18

*State v. Gallegos*, 2007-NMSC-007, 141 N.M. 185.                    14

*State v. Jones*, 1995-NMCA-073, 120 N.M. 185.                    14

*State v. Lamure*, 1992-NMCA-137, 115 N.M. 61.                    16

*State v. Lopez*, 1969-NMCA-057, 80 N.M. 599.                    18

*State v. Lucero*, 1992-NMCA-107, 114 N.M. 489.                    14

*State v. Otto*, 2007-NMSC-012, 141 N.M. 443.                    13, 27

*Pina v. Espinosa*, 2001-NMCA-055, 130 N.M. 661.                    24

*Matter of Reif*, 1996-NMSC-026, 130 N.M. 661.                    20

*State v. Sutphin*, 1988-NMSC-31, 121 N.M. 758.                    13

*State v Tollardo*, 2012-NMSC-008, ___ N.M. ___, 275 P.3d 110.                    16

### Other Cases

*Dunkley v. Shoemate*, 515 S.E.2d 442 (1999).                    26

*In re Michaelson,* 511 F.2d 882 (5th Cir. 1975).                    22

*Murphy v. Gorman,* 271 F.R.D. 296 (D.N.M. 2010).                   24

*Pavlinko v. Yale-New Haven Hospital,* 470 A.2d 246 (Conn. 1984).   24

*Rogers v. United States,* 340 U.S. 367 (1951).                     20

*S.F. Pacific Gold Corp. v. United Nuclear Corp.,* 2007-NMCA-133,
143 N.M. 215.                                                        20

*U.S. v. Lopez,* 777 F.2d 543 (10th Cir. 1985).                     25

*U.S. v. White,* 487 F.2d 1335 (5th Cir. 1973).                     22

*Westheimer v. Tennant,* 831 S.W.2d 880 (Tex. App. 1992).           24

## Rules

NMRA 5-116.                                                         22

NMRA 11–404(B)(1).                                                  14

NMRA 11–404(B)(2).                                                  14

NMRA 11-804(A).                                                     21, 23

NMRA 11-804(B).                                                     20, 22

NMRA 11-413.                                                        22

NMRA 16-100(E).                                                     22

NMRA 16-104(A)(1)-(3); Committee Commentary.                        23

UJI 14-2822(1).                                                     17

UJI 14-2823.                                                        17

**Other Authorities**

Graham, *Handbook of Federal Evidence* (5th ed.), Section 804.00          22

<u>Statement of Compliance with NMRA 12-318</u>

The text of this brief is set in Times New Roman, 14-point. The total number of words in the body is 8,212, based on the Word Count function of Word for Mac.

The transcript of live proceedings in this case was kept by audio recording. References to the transcript herein are according to Date/Hour/Minute/Second in the style, "TR 1/31/17 at 9:31:36."

70.

## STATEMENT OF THE CASE

*Precis*

Appellant Joe David Chavez Sr. was tried on charges of First-Degree Murder (Accessory), Conspiracy to Commit Murder, Arson and Tampering with Evidence in the District Court for Otero County on January 30 to February 6, 2017. He was convicted on all counts. This is his direct appeal.

The State's theory was as follows: Mr. Chavez was the head of a drug trafficking organization ("DTO") called the "AZ Boys," which had been plying the drug trade in Alamogordo. He had previously been convicted of racketeering in connection with the activities of the DTO. Matias Loza was a member of the DTO acting under direction of Mr. Chavez and his brother Robert.[1] He acted as the "enforcer" for the DTO. A Richard Valdez was a drug addict and dependent of the DTO. At an Applebee's restaurant in Alamogordo on or about November 30 of 2011, Valdez made noisy and disorderly demands of Loza and Robert Chavez for drugs and money. This made him a security threat to the DTO. Loza related the incident to Mr. Chavez, who tasked Loza with "hitting" Valdez. Within a day, Mr. Chavez brought Valdez to the home of his brother Robert. There Mr. Chavez held Valdez while Loza shot him. Mr. Chavez then took part in a plan to incinerate

---

[1] There are several Chavezes, including Appellant, his brother Robert, and his son Joseph ("Joey"). Counsel will only refer to Appellent Joseph Chavez Sr. as "Mr. Chavez" or "Joe Chavez."

Valdez's body, which Loza executed. The State urged the jury to find Mr. Chavez guilty as an accessory and co-conspirator.

See, generally, State's Opening Statement, 1/30/17 at 1:51:00 to 2:11:30; State's Closing Argument, 2/2/17 at 3:38:00 to 4:20:30.

The defense theory was as follows: The State could not and at trial did not establish a causal link between the alleged DTO and the death of Richard Valdez. There was no evidence that Valdez was anything more than an ill-tempered drunk who insulted Loza. In killing Valdez, Loza, an unstable and angry lout, was on a lark of his own, motivated solely by his sense of having been "disrespected" by Valdez. No aim of the DTO or of Mr. Chavez was contemplated or effected by the death of Valdez. The death of Valdez, however, was a potential threat to the DTO, and Mr. Chavez took part in the planning and early steps in the disposal of Valdez's body. Before, during and after trial, the defense challenged the admission of extensive uncharged misconduct evidence of the DTO on the ground that, in the absence of evidence of a link between the DTO and the killing of Valdez, the uncharged misconduct evidence was unfairly prejudicial to the defense, tending to show only that Mr. Valdez was a very bad man who headed up a DTO.

See, generally, Defense Opening Statement, 1/30/17 at 2:11:50 to 2:22:00; Defense Closing Argument, 2/2/17 at 4:21:15 to 4:52:30.

72

*State's Pretrial Proffer of Evidence of Link*

In a Minute Order denying the defense 2nd Motion in Limine on the uncharged misconduct evidence of the DTO, and based on the State's representations in its the response to the motion, RP 245 *ff.*, the trial judge found a permissible, non-propensity purpose of evidence of the DTO, to wit, to establish Mr. Chavez's motive and intent to have Loza, his alleged minion, kill Richard Valdez. At the direction of Mr. Chavez and his brother Robert, Richard Valdez was killed "to protect the integrity of the AZ Boys and the personal reputation of Joe and Robert Chavez," this quoting from the State's initial Notice of Intent to adduce the uncharged misconduct evidence – most specifically and tellingly that Richard Valdez was a drug user and the AZ Boys his supplier, and that he had made a scene at a local restaurant, demanding drugs and money in a threatening manner from Joe and Robert Chavez. Consequently, the proposed proffer went, Mr. Chavez ordered Loza to "take it outside." The court repeated, moreover, the representation of the State, made mere days before the trial, that it would produce an audio recording made by Loza on his mobile phone, showing Loza, and Joe and Robert Chavez talking about killing Valdez. The trial judge concluded that the State's theory in sum was to identify the motive for the killing of Valdez as "to remove an identifiable threat to the drug trafficking organization," commanded by Mr. Chavez. Finally, the court noted and relied upon the State's representation that it would present testimony that Loza told a fellow prison inmate that he, Loza, had

3

73.

been the "enforcer" for the "AZ Boys" and had killed Valdez as instructed by Joe and Robert Chavez. The trial court listed five evidentiary elements which the State had proffered and which would carry such probative value of motive and intent as to outweigh any unfair prejudice posed by evidence of the DTO and Mr. Chavez's position in it:

- that Richard Valdez consumed drugs supplied by the "AZ Boys" DTO;
- that Richard Valdez posed a substantial security threat to the organization;
- that this risk was demonstrated personally to Mr. Chavez prior to the killing;
- that Mr. Chavez took part in a search for Valdez in order to kill him, as shown by Loza's phone recording;
- that the killing was done by a member of the organization (Loza) who saw himself as an enforcer for the organization; and
- that Mr. Chavez participated in an attempt to conceal the circumstances of Valdez's death.

*Minute Order on Defendant's 2nd Motion in Limine*, RP 296 *ff.*

### Evidence Actually Adduced at Trial

**Tracy Garrison.** TR 1/31/17 at 9:03:40 to 10:40:30. This was Mr. Chavez's girlfriend. She was a user of methamphetamine, though Mr. Chavez was not. She described Mr. Chavez, his brother Robert, Mr. Chavez's son Joey, and Matias Loza as involved in a drug distribution enterprise. Mr. Chavez kept drugs and money in his office at their house. She testified that, at Mr. Chavez's behest, she laundered money on behalf of the DTO by putting a number of vehicles purchased with cash proceeds of DTO activity under her own name. TR 1/31/17 9:06-9:20. She was charged with money laundering and racketeering as a result and was testifying to work off charges. She understood she was exposed to 21 years in prison – all of

4

which the State would ask the court to suspend, if she should testify truthfully in the cases against the "AZ boys," including in the current trial of Mr. Chavez. TR1/31/17 at 9:25-9:27. She testified on cross-examination that she would do anything for her children. TR 1/31/17 at 10:27:00.

Garrison testified that Mr. Chavez made statements to her concerning an incident at the Applebee's a day or two before Richard Valdez was killed. She said Mr. Chavez told her there had been a fight at Applebee's between Loza and Valdez, but he said nothing about the cause or nature of the dispute. TR 1/31/17 at 9:33:290. She said that he later described the shooting of Mr. Valdez at Robert Chavez's house. She testified that Mr. Chavez said "we killed Richard." In her pretrial interview, she had told defense counsel that Mr. Chavez had said "they" had. She testified that he said that when he walked into the house, Valdez was apologizing, and "we grabbed him," there was a struggle, Mr. Chavez held Valdez, and Loza shot him. TR 1/31/17 at 9:37:00. Then, Mr. Chavez had told her, he took part in the disposal of Mr. Loza's body. Ms. Garrison testified she had not given a statement to anyone about the matter for years after the incident itself. TR 1/31/17 at 9:33:00-9:37:00; 10:24:25 to 10:38:20.

As for the motive for the killing of Loza, all Ms. Garrison had gathered from Mr. Chavez's conversation was that "somebody disrespected somebody." TR 1/31/17 at 10:39:11.

75.

Ms. Garrison testified that she took a polygraph examination from a police examiner on her involvement in the killing. She was asked, first, whether she was present when Richard Valdez was killed and answered, "No." She was asked, second, whether Mr. Chavez had confessed to her that he had been involved in the killing. RP 227. She answered, "Yes." She understood at the time and testified at trial that she had "passed" the exam. TR 1/31/19 at 9:44:40. However, because of "quality measures" problems with the examination, the State withdrew its intent to call the police polygraph examiner to the stand at trial. RP 207. The defense then called as a witness a polygraph examiner of its own who had reviewed Ms. Garrison's examination. He testified, *over the State's objection*, RP 214, that Ms. Garrison had given deceptive answers to the questions in the polygraph examination. TR 2/2/17 at 1:41:00. On cross of the defense examiner, the prosecution now attacked the validity and reliability of polygraphy *itself*, TR 2/2/17 at 2:05:40 to 2:28:52, and told the jury in closing argument that polygraphy is "junk science" and "doesn't mean anything." TR 2/2/17 at 4:10:01.

Ms. Garrison was permitted to testify, over defense objection, that Mr. Chavez had beaten and injured her early in their relationship for "making a scene." TR 1/31/17 at 9:48:50.

Sheriff's Deputy **Preston Eldridge**. TR 1/31/17 at 3:12:00 to 3:51:00. Over repeated defense objections, Dep. Eldridge gave forty minutes of testimony concerning the involvement of Mr. Chavez and the "AZ Boys" in the illegal drug

76.

trade, including phony police buys from Mr. Chavez, large amounts of drugs and cash found in Mr. Chavez's home, money laundering, and newspaper clippings concerning the killing of Richard Valdez. Eldridge testified on defense cross that extensive surveillance over seven months in 2011-12 had produced no evidence that Richard Valdez was a drug user or involved in drug trafficking or that Joe Chavez or any "AZ Boy" had ever sold him drugs. TR 1/31/17 at 3:43:50 to 3:51:22.

**Fabian Picazzo** of the State Police gave extensive testimony of alleged money laundering activity on the part of the "AZ Boys," and told about staking out Mr. Chavez's house. It was through Picazzo that the prosecution offered and played for the jury two audio recordings, discussed below, made by Loza before and after the killing of Valdez. He admitted that Mr. Chavez was *not* on the recording which was made prior to the killing of Valdez and in fact showed only Robert, Joey Chavez and Loza looking for Valdez and planning his murder. TR 2/1/17 at 3:30:00 to 3:33:53, 3:36:58. He admitted, moreover, that the recording featured no mention of instructions from Mr. Chavez and no mention of Valdez being a threat to the DTO. TR 2/1/17 at 3:37:33 to 3:38:00. There was no recording of Mr. Chavez saying anything prior to the death of Valdez. TR 2/1/17 at 3:42:16.

Sheriff's Deputy **Rodney Schmark**. TR 2/2/17 at 9:05:40 to 9:18:40. Dep. Schmark testified that he searched Mr. Chavez's home in May of 2011 and seized large amounts of cash, a gallon bag of marijuana, evidence of money laundering,

several cell phones (working and not working), drug paraphernalia, newspaper clippings concerning the death of Valdez, and storage unit bills.

The State called **Jude Sanchez**, a state prisoner who had been incarcerated in the same prison with Matias Loza, to relate statements Loza made to Sanchez concerning the death of Valdez. The defense objected on the basis of hearsay and confrontation.

In order to establish Loza's unavailability pursuant to NMRA 11-804(A), on the ground that he would "take the Fifth" if called in Mr. Chavez's trial, the State called **Stephanie Gulley Esq.**, an attorney in private practice, who testified briefly out of the presence of the jury. TR 1/31/17 at 3:59:00–4:15:00. At the time of her testimony, Ms. Gulley had contracted with the Public Defender to represent Loza in *State v. Loza*, CR 2014-00063 (Otero Co.), which was pending at the time of Mr. Chavez's trial, and in which Loza was charged with killing Richard Valdez. TR 1/31/17 at 4:00:28.

**Ms. Gulley** believed Loza to be in "county detention" somewhere but she did not know where. TR 1:31:17 at 4:00:44. She had never met or spoken to him. TR 1/31/17 at 4:03:40. She believed a predecessor attorney for Loza had spoken to him about testifying in the Joe Chavez trial, but she did not know this. TR 1/31/17 at 4:02:20. She did not know whether Loza would invoke the privilege, only that in his position she would do so. TR 1/31/17 at 4:03:10. She also testified that it was on the basis of something in her predecessor's files that she was invoking the Fifth

on Loza's behalf, but refused to answer defense counsel's follow-up question as to what the files showed – now claiming, "I think that goes into attorney-client privilege" and/or "work product and all of that." TR 1/31/17 at 4:04:50. The trial court enforced this claim of privilege, prohibiting the defense from inquiring further on the subject. The judge stated he, like Ms. Gulley, believed anyone in Loza's position would surely, as a matter of logic, elect to take the Fifth. TR 1/31/17 at 4:10:06. Hence, the trial judge found Loza to be unavailable pursuant to Rule 804(A), and permitted Jude Sanchez to testify as to Loza's prison statements to him as statements against interest within the meaning of Subsection 3 of Rule 804. TR 1/31/17 4:05:55, 4:10:28.

**Jude Sanchez** now testified that he had been incarcerated in the same prison with Matias Loza. He testified that Loza had told him he was an "AZ Boy." Loza had related, in a bragging manner, that he was down from Arizona to sell drugs with Mr. Chavez and his brother Robert and to be an enforcer for them, explaining that the Chavezes were running the illegal drug trade in Alamogordo. Loza and Mr. Chavez were good friends. Loza shot Joe's daughter's boyfriend – identified at various points in the trial as Richard Valdez – at a house in Alamogordo. Mr. Chavez had brought Valdez to a house where Loza and Valdez had been smoking dope, and he, Loza, shot Valdez. Later, Mr. Chavez followed Loza in another vehicle as the latter was taking Valdez's body somewhere to be incinerated, but

79.

Mr. Chavez pulled off and away when Loza began driving erratically. TR 1/21/17 at 4:17:30 to 4:25:50.

The prosecution had also included on its pretrial witness lists a **Rigo Rodriguez**, who was purported to be another witness to incriminating prison conversations with Loza. *E.g.*, State's Amended Witness List, RP 123. The defense noted this in its 2nd Motion in Limine and recited that the defense had contacted Rodriguez and he had no recollection of any such conversation with Loza. RP 211. The prosecution made no further references to Rigo Rodriguez, *see e.g.*, Response to Motion in Limine, RP 245 ff., and did not call him as a witness at trial.

The State claimed in its opening statement that Mr. Chavez had told Ms. Garrison that Mr. Chavez had witnessed Richard Valdez being disrespectful to Loza at an Applebee's restaurant in Alamogordo, that Loza had grabbed a knife in response, and that Mr. Chavez told the two of them to "take it outside." TR 1/30/17 at 1:59:49. The State's purpose was to show the "corporate structure" of the DTO. TR 1/31/17 at 2:44:49. At trial, the State called **Angel Gonzales**, an Applebee's employee, concerning the unpleasantness between Loza and Valdez that Ms. Garrison said Mr. Chavez had said occurred at Applebee's. TR 1/31/17 at 2:31:20 *ff.* Ms. Gonzales was the only witness claiming to have been present in the Applebee's that night. She testified that the "AZ Boys" had come into the restaurant frequently over a few years. It was she who had coined the term "AZ Boys" for the Chavezes and Loza because she understood they were from Arizona.

80.

TR 1/31/17 at 2:43:20. She knew nothing of involvement of the Chavezes in the drug trade. TR 1/31/17 at 2:50:40. Ms. Gonzales knew no one named Richard Valdez, and knew nothing about any involvement of the "AZ Boys" in illegal drugs. TR 1/31/17 at 2:52:40. The Chavezes were in any event "high rollers." Robert Chavez in particular could be an extravagant tipper. She had gone to a strip club once with Mr. Chavez. On the night of November 29 or 30, she was at work at Applebee's, but did not see Mr. Chavez or Loza, and did not know who Richard Valdez was. TR 1/31/17 at 2:52:40.

Ms. Gonzales was permitted to testify concerning a Halloween party – apparently the same night as the incident at Applebee's. This was over defense objection that the party did not bear on Mr. Chavez in any way. TR 1/31/17 at 2:45:23. She said the "AZ Boys" crashed this party and that Loza was present, but not Mr. Chavez or Richard Valdez. Loza was drunk and disorderly. Ms. Gonzales asked him and Robert Chavez to leave, which made Loza feel she was being disrespectful, and he asked Robert Chavez if he should kill everyone present. TR 1/31/17 at 2:48:41 to 2:49:00.

There was extensive litigation before and during the trial concerning the audio recordings made by Loza on his mobile phone. One, admitted over defense objection as Exhibit 78, TR 2/1/17 at 10:45:00 *ff.*, was identified as a recording made after the "fight" at Applebee's and before the death of Stephen Valdez, and was offered as a discussion between Loza, Robert Chavez, and Joey Chavez, and

81.

suggesting they were hunting for someone they intended to shoot. TR 2/1/17 at

3:33:13. Prior to the playing of the recording for the jury, it emerged that there was

and would be no testimony that Mr. Chavez was a participant in this conversation,

TR 2/1/17 at 3:36:36. Moreover, this recording contained no evidence of

instructions from Mr. Chavez to kill Richard Valdez, TR 2/1/17 at 3:37:50, and no

evidence of Valdez constituting a threat to Mr. Chavez personally or the "AZ

Boys" in general. TR 2/1/17 at 3:38:00.

    A second Loza audio recording, admitted over defense objection as Exhibit

77, TR 2/1/17 at 2:31:40, appeared to be a discussion between Mr. Chavez, and

Robert and Joey Chavez, as well as Loza, in the course of which Valdez's body

was loaded into the trunk of a car and taken to be incinerated. On the basis of this

evidence, the defense did not move for a directed verdict on the tampering charge

against Mr. Chavez either after the State rested or after all evidence. TR 2/1/17 at

10:57:50.

    The State called DNA analyst **Annette Ortiz**, who testified that blood of

Richard Valdez was found in two places on the walls at the home of Robert

Chavez. TR 2/1/17 at 1:40:50. On cross-examination she testified that she had

eliminated Joe Chavez from all samples she had been given to analyze in the case,

including clothing belonging to Loza, nail scrapings from Loza, gloves, a pair of

black tennis shoes, the gas can cap, a gun and a shot gun. TR 2/1/17 at 1:45:07 to

1:46:12.

82.

## ARGUMENT

For the reasons stated herein, this Court should reverse Mr. Chavez's

convictions on the crimes of Murder and Conspiracy and remand for a new trial.

**I.   THE EVIDENCE ACTUALLY ADDUCED AT TRIAL OF A LINK BETWEEN THE INTERESTS OF THE DTO AND THE KILLING OF VALDEZ FELL FAR SHORT OF THE STATE'S PRETRIAL PROFFER, SO THAT THE TRIAL COURT'S ADMISSION OF THE "ASSOCIATION" EVIDENCE WAS BASED ON A GROSS OVERESTIMATE OF THE PROBATIVE VALUE OF THE DTO EVIDENCE, WHILE ITS UNAFAIR PREJUDICE TO MR. CHAVEZ REMAINED EXTREME.**

**Standard of Review.** This Court reviews a district court's decision to admit evidence under Rule 404(B) for an abuse of discretion. *State v. Otto,* 2007-NMSC-012, ¶ 9, 141 N.M. 443. The same standard applies to a denial of a motion for mistrial. The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction. *State v. Sutphin,* 1988-NMSC-31, 753 P.2d 1314.

**Issue Preserved.** The heavily-litigated issues surrounding the question whether to admit evidence of the DTO emerged initially in the pretrial State's Notice of Intent to Introduce Association Evidence. RP 101-02. The issue was preserved by the Defense Motion to Strike the proposed evidence, RP 171-72; by the response filed to the State's motion in limine to admit the evidence; by the defense motion for directed verdict or for mistrial, TR 2/2/17 at 10:53:30 *ff*; by the Defendant's Second Motion in Limine, RP 210-13; and by the Defendant's post-trial Motion for Sanctions for Prosecutorial Misconduct and for Mistrial. TR 2/8/17, RP 352 *ff*. Moreover, following the testimony of prosecution witness Angel Gonzales and prior to the testimony of Jude Sanchez, the court asked the parties whether either had any matters to raise. Defense counsel responded that the defense did not, but "subject to our prior objections," and the court responded, "You have a continuing objection." TR 1/31/17 at 3:08:36.

"Evidence of a crime, wrong, or other act is not admissible to prove a

person's character in order to show that on a particular occasion the person acted in

83.

accordance with the character." Rule 11–404(B)(1). The initial threshold for admissibility of evidence of other crimes, wrongs or acts is whether the evidence is probative on any essential element of the charged crime. *See State v. Aguayo*, 1992-NMCA-044, ¶ 18, 114 N.M. 124. First, the court must determine if there is "an articulation or identification of the consequential fact to which the proffered evidence of other acts is directed" that satisfies a valid exception to the general prohibition on propensity evidence. *State v. Jones*, 1995-NMCA-073, ¶ 5, 120 N.M. 185. Thus, the other-act evidence may be admissible for other purposes, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11–404(B)(2). However, even if the other-acts evidence is relevant to something other than propensity, the court must not admit the evidence if the probative value related to the permissible purpose is substantially outweighed by the Rule 403 factors. *See State v. Gallegos*, 2007-NMSC-007, ¶ 22, 141 N.M. 185; *See State v. Lucero*, 1992-NMCA-107, ¶ 9, 114 N.M. 489 ("Testimony which amounts to evidence of a defendant's bad character or disposition to commit the crime charged is clearly inadmissible").

The trial court erred in admitting the extensive uncharged misconduct evidence concerning the DTO against Mr. Chavez. As the trial court clearly gathered before trial, the articulated non-propensity purpose of the DTO evidence was to show that Richard Valdez had become a security threat to the organization and/or to its "integrity." In short, the DTO evidence showed Mr. Chavez's motive

84,

or intent to direct and/or participate in the killing of Valdez. The defense warned that the State would not in fact supply the link between the DTO and the death of Valdez.

In ruling on defense motions for directed verdict and/or mistrial following the prosecution case, TR 2/2/17 at 11:36:40 *ff.*, the trial judge ruefully admitted that the prosecution's proffer of the link had not materialized:

> The representations before trial did not turn out to be the evidence that came out at trial. That is a matter of record.

pages 15—19

TR 2/2/17 at 11:37:15 (emphasis added). The judge specified that the prosecution had failed as promised to adduce evidence that Mr. Chavez was involved in the proffered "fight" at Applebee's and failed as promised to adduce evidence that Mr. Chavez participated in the "hunt" for Valdez later.  Yet the judge denied the motion for mistrial and/or directed verdict, reciting that there was enough evidence of the link between the DTO and the death of Valdez to justify admission of all the uncharged "association" evidence. By way of justification, the judge named exactly one piece of evidence, to wit: Even though Stacy Garrison had stated repeatedly before trial that Mr. Chavez had told her "they" (Loza and Robert Chavez) had killed Valdez, at trial she said he said "we" killed Valdez. TR 2/2/17 at 11:37:15. In short, the judge seized on one of several statements by a witness who had failed a polygraph examination and who was looking to testify her way

85

out of 21 years in prison. This was a very wispy tail with which to wag a very big dog.

As this Court noted in *Aguayo*, "uncharged misconduct is generally 'one of the most damning species of evidence.'" 1992-NMCA-044, ¶ 25 (internal citations omitted). In this case, it allowed the jury to draw the impermissible inference that because Mr. Chavez "headed a drug trafficking organization," he would hardly stick at the killing of a reckless and mouthy drug addict. Moreover, it is hard to overestimate the effect of such knowledge on the jury's sense of potential remorse concerning a wrongful conviction. And if, first and last, the jury does not hear substantial evidence of a link between DTO business and the death of Valdez, the Rule 404(B) theory of intent and motive dissolves, and the jury is at sea. The improperly admitted uncharged misconduct evidence rushes into that vacuum.

Error in admitting improper evidence is anything but harmless where there is a reasonable probability that it contributed to a guilty verdict. *State v. Tollardo*, 2012-NMSC-008, ¶¶ 43-44, ___ N.M. ___, 275 P.3d 110; *accord State v. Lamure*, 1992-NMCA-137, 115 N.M. 61 (Hartz, J. concurring) ("One cannot ignore the long tradition of courts and commentators expressing fear that jurors are too likely to give undue weight to evidence of a defendant's prior misconduct and perhaps even to convict the defendant solely because of a belief that the defendant is a bad person").

To establish accessorial liability, the only theory as to Mr. Chavez, the State must bring proof beyond a reasonable doubt that the defendant "intended that the crime be committed." UJI 14-2822(1). Moreover:

> Mere presence of the defendant, and even mental approbation, if unaccompanied by outward manifestation of expression of such approval, is insufficient to establish that the defendant aided and abetted a crime.

UJI 14-2823. The prosecution did not establish this link at trial. The trial judge permitted the prosecution to adduce all the evidence of the activities of the DTO without substantial evidence that the death of Chavez advanced or was intended to advance the interests of the DTO – and no one suggested another reason to admit this grossly prejudicial information against Mr. Chavez.

As it came out in the wash, the prosecution brought no proof of knowledge or motive or intent or common design, *State v. Davis*, 1978-NMCA-122, 92 N.M. 342, and no testimony of an agreement. The "hunt" or "planning" recording, Exhibit 78, may be evidence of a conspiracy of Robert Chavez, Joey Chavez and/or Loza, but not Joe Chavez. The State failed to bring evidence, as proffered prior to trial, that Loza's killing of Richard Valdez was an activity of the DTO in response to threat a threat to the security or integrity of the organization.

The evidence actually adduced showed Loza and Robert Chavez as easily insulted, unpleasant people, especially when under the influence of alcohol, who, when they saw themselves as insulted, would threaten people and even shoot

97.

people. In the Valdez matter litigated in this case, there was no proof this random thuggishness was connected to aims of the DTO.

The question is not simply whether the State put on a prima facie case of murder and/or conspiracy as to Mr. Chavez but whether the jury would have convicted Mr. Chavez *in the absence of the uncharged misconduct evidence*.

Generally, evidence of a distinct criminal offense independent of the offense with which the defendant is charged and for which he is being tried is inadmissible. *State v. Lopez*, 1969-NMCA-057, 80 N.M. 599; *see* Second Motion in Limine, RP 210-13. The probative force of such evidence of a distinct, uncharged offense – here "racketeering" – must bear directly on some material element of the crime with which the defendant is charged. "The initial threshold for admissibility of prior uncharged misconduct is whether it is probative on any essential element of the charged crime." *State v. Fuson*, 1978-NMCA-2, 91 N.M. 366. Here that would be Mr. Chavez's intent or motive. Evidence of the distinct misconduct should not be received when the overwhelming result would be, as in this case, nothing more than a demonstration of the defendant's bad character or propensity to engage in crime. *Lopez, supra*. While trial courts have discretion to strike a balance between probative value and prejudice, they must always be sensitive to the potential prejudice inherent in evidence of the defendant's prior, uncharged misconduct. *State v. Aguayo*, 1992-NMCA-044, 114 N.M. 124.

The trial court's denial of the directed verdict and mistrial motions on the grounds that the prosecution still had Garrison and Loza involving Mr. Chavez in the killing itself makes sense only with respect to the directed verdict motion. It does not bear on the defense motion for a mistrial on grounds that the prosecution failed to adduce evidence of the link between the uncharged misconduct evidence and the killing of Valdez. The trial judge admitted after the prosecution case that the promised evidence had not materialized, but the court really said nothing – there was little to say – concerning the consequences of its pretrial decision to permit the prosecution to put on massive evidence of the DTO on the prosecutors' mere representations that they would show the link.

In short, the trial court gambled – with Mr. Chavez's money – that proof of the link would come in. It did not. As a result, Mr. Chavez was deprived of a just and fair trial.

## II.    THE STATE SHOULD NOT HAVE BEEN PERMITTED TO CALL JUDE SANCHEZ TO TESTIFY CONCERNING HIS PRISON CONVERSATION WITH MATIAS LOZA AS A STATEMENT AGAINST INTEREST BECAUSE THE PROSECUTION DID NOT ESTABLISH LOZA'S UNAVAILABILITY.

**Standard of Review.** Our courts review the admission of a statement against penal interest pursuant to Rule 804(B)(3) by considering whether, in light of all the surrounding circumstances, it was an abuse of discretion to admit the statement. *State v. Duarte*, 2004-NMCA-117, 98 P.3d 1054.

**Issue Preserved.** The defense objected to Jude Sanchez being permitted to testify on the grounds that the State had not established Loza's unavailability for purposes of Rule 804(A). TR 1/31/17 at 4:06:58 *ff.*

As explained above in the Statement of the Case, the prosecution relied heavily on the supposed word of Matias Loza that he was a hitter for the DTO and that he and Mr. Chavez killed Stephen Valdez. The prosecution called Jude Sanchez to testify that Loza had told him this when the two of them had been in prison together. The prosecution offered this hearsay as a statement against penal interest within the meaning of Rule 804(B)(3). The prosecution, however, failed to establish Loza's unavailability pursuant to Subpart A of the rule. The jury should never have heard the testimony of Jude Sanchez.

### No Relationship Between Loza and Attorney Claiming Fifth

The trial judge permitted the prosecution to establish Mr. Loza's unavailability through the testimony of Ms. Gulley, the contract attorney who had been assigned to his case and who did not know where Loza was and had never spoken to him. Nothing in our rules gives sanction to this apparent absurdity. An attorney's duty to communicate with the client is "affirmative" – that is, an attorney must take the initiative to tell the client what is going on, and if the client needs additional information, supply it. *Matter of Reif*, 1996-NMSC-026, ¶ 17, 121 N.M. 758.

Ms. Gulley could not claim the privilege on her own behalf and appeared to admit this on cross, agreeing with defense counsel that the privilege against self-incrimination is "a personal right," which is held by the client. *Rogers v. United States*, 340 U.S. 367 (1951); *accord S.F. Pacific Gold Corp. v. United Nuclear*

90.

*Corp.*, 143 N.M. 215, 175 P.3d 309 (2007) (client is the holder of attorney-client privilege).

The trial judge announced he was finding that Mr. Loza was taking the Fifth for the same spurious reason cited by Ms. Gulley, namely, that it would be "logical" for Mr. Loza to do so in the circumstances. On this basis, he found Mr. Loza "unavailable" within the meaning of Rule 804(A). There is a clear implication in the comments of the prosecutor and the trial judge to the effect that there was really nothing for Loza and his attorney to discuss. Anyone can see – "logic" dictates – that Loza would take the Fifth. TR 1/31/17 at 4:06:40-4:08:30. There are two serious problems with this.

First, Loza may have declined to take the Fifth for reasons that make no sense to lawyers and judges and which defy logic. The right was his, and his lawyer was his lawyer, not a guardian acting *in loco parentis*. The prosecutor and the trial judge misapprehended the nature of the relationship between attorney and client. Regardless of what Ms. Gulley might have advised Loza to do, had she ever spoken to him, the decision was his:

> The relation of attorney and client rests on principles of agency, **not of guardian and ward**.

*State v. Barley*, 81 S.E.2d 772, 773 (N.C. 1954) (emphasis added).

Second, it takes little ingenuity to imagine substantive reasons which might have motivated a perfectly logical person in Loza's position to take a different

21

91.

course than simply instructing his attorney to take the Fifth on his behalf. For example, his lawyer might have raised the possibility of negotiating for use immunity:

> An attorney's ability to assert the Fifth Amendment on behalf of his client depends on the client's ability to assert the privilege on his own behalf; thus, an attorney may not assert such privilege where the client cannot do so on his own behalf because of a grant of immunity.

*In re Michaelson*, 511 F.2d 882, 891 (5th Cir. 1975); *accord U.S. v. White*, 487 F.2d 1335, 1340 (5th Cir. 1973). It does no good, moreover, to speculate on whether such a negotiation would have succeeded. The point is the lawyer did not discuss this possibility with Loza or in any other way advise him of "reasonable available alternatives to the proposed course of conduct," as required by NMRA 16-100(E), such as negotiating a grant of testimonial immunity. *See* NMRA 5-116 (Witness Use Immunity); NMRA 11-413 (Use of Evidence Obtained Under Immunity Precluded).

"It has been asserted that the government may not refuse to grant a witness immunity and then claim the witness is unavailable based upon the witness' assertion of a fifth amendment privilege in support of offering of former testimony under Rule 804(b)(1)." Graham, *Handbook of Federal Evidence* (5th ed.), Section 804.00, n. 25.

Rule 104 of the Rules of Professional Conduct concerns communication between attorney and client. Subsection A, "Status of matters," requires the lawyer

92.

to "promptly inform the client of any decision or circumstance with respect to which the client's informed consent … is required," to "consult with the client about the means by which the client's objectives are to be accomplished," and to "keep the client reasonably informed about the status of the matter." NMRA 16-104(A)(1)-(3). The Committee Commentary suggests no scenario in which no communication at all between attorney and client would be enough for the attorney to explain a matter, such as the choice between standing on a constitutional right or negotiating a waiver of it, discussing the means of accomplishing the client's objectives, or resolving the "action the client wants the lawyer to take." *See* Committee Commentary ¶¶ 2-5. The Commentary does state that the duty of prior consultation may be relaxed "when an immediate decision must be made …." Committee Commentary ¶ 3. But in <u>examining</u> Ms. Gulley, the prosecution developed no testimony that she was confronted with some such an exigency and made no such argument to the judge.

Loza was not given the opportunity to give informed consent to the course of conduct taken by Ms. Gulley. Loza's unavailability for Rule 804(A) was not established.

### *Defense Blocked from Examining on Factual Basis of Claim of Fifth*

There was one more turn of the screw. Ms. Gulley purported to take the Fifth on Loza's behalf on the basis of mere logic but also in reliance on unspecified "files" of a predecessor attorney, which she testified supported the claim of the

23

93.

Fifth in some unspecified way. Defense counsel naturally proceeded to inquire into the nature of this claim, but Ms. Gulley cut that inquiry short, claiming "attorney client privilege" and "work product and all that," TR 1/31/17 at 4:04:50, and the trial judge shut the inquiry down. This was error.

The party asserting attorney-client privilege has the burden of demonstrating that it applies and that it has not been waived. *Murphy v. Gorman*, 271 F.R.D. 296 (D.N.M. 2010).

Ms. Gulley's claim of attorney-client privilege was, first, without claim of authority coming from the client and, second, based on "files" the nature of which she refused to disclose. Fundamental fairness requires a party to elect between claiming privilege or asserting a claim as to which privileged matters are material and relevant. *See Westheimer v. Tennant*, 831 S.W.2d 880, 883 (Tex. App. 1992); *cited in Pina v. Espinosa*, 2001-NMCA-055, ¶ 19, 130 N.M. 661. It was fundamentally unfair for the trial judge in this case to permit Ms. Gulley to rely on unspecified "files" indicating in an unspecified manner that Loza wished to claim the Fifth and then disallowing defense counsel to inquire into the specifications:

> **A plaintiff cannot use one hand to seek affirmative relief in court and with the other lower an iron curtain of silence against otherwise pertinent and proper questions** which may have a bearing upon his right to maintain his action.

*Pavlinko v. Yale-New Haven Hospital*, 470 A.2d 246, 251 (Conn. 1984) (emphasis added), *cited in Westheimer v. Tennant*, supra. This is what the trial court allowed

44.

Ms. Gulley to do. She sought the affirmative relief of the attorney-client privilege and, when defense counsel attempted a proper inquiry into the basis of the claim, the judge permitted her to "lower an iron curtain of silence."

Furthermore, Ms. Gulley's claim of attorney-client privilege "or work product and all that" was strictly contrary to our procedure. Privileges against disclosure of confidences are governed in New Mexico by NMRA 11-503 (Lawyer-client privileges). Privileges can be claimed by a lawyer on behalf of a client, but not any lawyer. Subpart C of the rule requires that the "lawyer of the client **at the time of the communication** may claim the privilege and **only on behalf of the client**." (emphases added). In this instance, Ms. Gulley indicated that she was not appointed as Mr. Loza's contract counsel at the time of any discussion of his decision to take the Fifth. Either some predecessor attorney was – or no one was. The predecessor would be the lawyer who might have been called to establish the claim of attorney-client privilege. Ms. Gulley did not claim to have communicated with Loza about the situation at any time.

Moreover, an important element of attorney-client privilege is whether communications between client and attorney were made in confidence of the relationship and under circumstances from which it could reasonably be assumed that the communication would remain in confidence. *U.S. v. Lopez*, 777 F.2d 543 (10th Cir. 1985). The State developed no evidence to satisfy this requirement.

The procedure followed by the prosecution and Ms. Gulley and sanctioned by the trial court was riddled with problems, and it served to deprive Mr. Chavez of the right to confront a critical witness against him – and that in a case involving essentially two witnesses of that kind and description.

This was clear error. Rule of Evidence 11-503(C) lists those who may claim the attorney-client privilege. The client may do so. The client's lawyer, on his own stick, may not ("only on behalf of the client"), and only the lawyer of the client at the time of the communication may do so.

The prosecutor indicated he had contacted Ms. Gulley in the weeks prior to trial to discern what Mr. Loza's "intentions" were with respect to testifying at Mr. Chavez's trial. TR 1/31/17 at 4:00:30. She testified that it was "his [Loza's] wishes" not to testify or be transported to court. She did not learn these wishes by communicating with him, however, but "believed" her predecessor had done so, then blocked inquiry into the basis of that belief.

Ms. Gulley had never spoken to Loza. A "lawyer cannot properly represent a client with whom he has no contact." *Dunkley v. Shoemate*, 515 S.E.2d 442, 445 (1999).

### Concerning Standard of Review on Appeal

This Court must take Ms. Gulley's brief testimony at face value, simply because neither side nor the trial court questioned it. There were no disputed facts for the judge to sift and weigh, and he made no disputed factual findings for this

26

96.

this Court to defer to. However, the trial judge's conclusion that Loza had taken

the Fifth based on his, the trial court's, sense that Loza as a logical man would

have done so, is a legal conclusion, is entitled to no deference, and should be

reviewed de novo. "On appeal, we review the [district] court's findings of fact for

substantial evidence and review de novo the ultimate determination of whether a

defendant validly waived his or her Miranda rights prior to police questioning."

*State v. Barrera,* 2001-NMSC-014, 130 N.M. 227.

Permitting Jude Sanchez to stand in for Matias Loza was clear error. This

Court should review the decision de novo and hold that the State did not establish

Loza's unavailability. Jude Sanchez testified to inadmissible hearsay.

## III. THE COURT PERMITTED THE STATE TO ADDUCE HIGHLY PREJUDICIAL EVIDENCE THAT MR. CHAVEZ WAS A "WIFE-BEATER" IN THE ABSENCE OF ANY NON-PROPENSITY PURPOSE TO THE EVIDENCE.

**Standard of Review.** This Court reviews a district court's decision to admit evidence under Rule 404(B) for an abuse of discretion. *State v. Otto,* 2007-NMSC-012, ¶ 9, 141 N.M. 443. In the case of unpreserved error, the reviewing court will consider issues involving plain error or fundamental rights. *State v. Begay,* 1998-NMSC-29, 125 N.M. 541.

**Issue Preserved.** Second Motion in Limine, RP 210-13; *see* State's Response at RP 247 (arguing admission of beating incident).

As stated above in the Statement of the Case, the trial court permitted Tracy

Garrison to testify that Mr. Chavez had beaten her, breaking her ribs, early in their

relationship. She testified that he did this to her because she was "making a scene"

in public. Ms. Garrison gave no evidence suggesting what this incident did besides

injure her. There was no testimony by any other witness concerning this incident, the reason for it, or the consequences of it. The testimony assuredly made Mr. Chavez look like a "wife-beater" who should not be accorded the presumption of innocence in the current trial. Admission of this uncharged misconduct evidence was an abuse of discretion and/or plain error affecting Mr. Chavez's fundamental right to a fair trial.

IV.  **THE PROSECUTION MADE CRITICAL, MISLEADING REPRESENTATIONS PRIOR TO TRIAL CONCERNING THE NATURE OF THE LOZA RECORDINGS, WHICH MISREPRESENTATIONS WERE NOT CORRECTED TILL MID-TRIAL, AND WHICH MISLED COURT AND COUNSEL AND AFFECTED DEFENSE STRATEGY.**

Statement of the Case, there was extensive litigation before and during the trial concerning two audio recordings made by Loza on his mobile phone. One, admitted over defense objections to the transcript, based on best evidence and late discovery – TR 2/1/17 at 10:45:00 to 1:05:00 to 1:25:39 – as Exhibit 78, was identified as a recording made after the incident at Applebee's and before the death of Richard Valdez, and was offered as a discussion between Loza, Robert Chavez, and Mr. Chavez's son Joey, and suggesting they were hunting for someone they intended to shoot. TR 2/1/17 at 3:33:13. As late as mid-trial, the prosecution had given the impression that Mr. Chavez was one of the participants in the conversation, by listing Mr. Chavez as such on the cover sheet of a transcript of the recording. By the time came for the playing of the recording for the jury, it had

98.

become clear that **there was and would be no evidence that Mr. Chavez was a participant in this conversation**. TR 2/1/17 at 3:36:36. This recording, hence, contained no evidence of instructions at that or any other time from Mr. Chavez to kill Valdez, TR 2/1/17 at 3:37:50, and no evidence of Valdez constituting a threat to Mr. Chavez personally or the "AZ Boys" in general. TR 2/1/17 at 3:38:00.

Because it eventually emerged that Mr. Chavez took no part in this "hunt" or "planning" discussion, and because the jury heard no differently, Appellant does not challenge the admission of the recordings on the basis of the late discovery issues litigated just before and during trial. However, it is without cavil that even after commencement of the trial the prosecution was still representing to the defense that Mr. Chavez was one of the participants in the "planning" recording and conversation. *See* TR 1/31/17 at 11:22:00 to 12:07:00. The prosecution did not clear this up until trial was well underway. In response, the defense argued, with notable restraint, that the late discovery of the true contents of the "planning" recording misled the defense, affecting trial strategy. Had the defense known no one was claiming Mr. Chavez was part of that "planning," **it would at a minimum have dramatically strengthened its response to and the judge's weighing and handling of the prosecution proffer of uncharged misconduct evidence,** the DTO association evidence. It would have affected the trial court's pretrial balancing of probative value and unfair prejudice lurking behind any and all

99.

analyses pursuant to Rule 404(B). It all looks different if there is no evidence that

Mr. Chavez went looking for Richard Valdez with other "AZ Boys."

**V.    THE MULTIPLE ERRORS COMPLAINTED OF IN THIS APPEAL AMOUNTED TO REVERSIBLE CUMULATIVE ERROR NOT ONLY BECAUSE OF THE NUMBER OF ERROS BUT ALSO BECAUSE OF THE WAY THE ERRORS INTERTWINED TO DEPRIVE MR. CHAVEZ OF A FAIR TRIAL.**

At the conclusion of the State's case, on an oral motion for mistrial, the

defense claimed cumulative error. TR 1/31/17 at 9:38:50; *see also* 2/2/17

at11:16:00 *ff.*

"The doctrine of cumulative error applies when multiple errors, which by

themselves do not constitute reversible error, are so serious in the aggregate that

they cumulatively deprive the defendant of a fair trial." *State v. Salas,* 2010-

NMSC-028, ¶ 39, 148 N.M. 313 (internal quotation marks and citation omitted).

In this case, it is not a matter merely of multiple errors but of multiple errors

which are intimately intertwined. The errors in admitting unfairly prejudicial

information worked cumulatively to seriously exacerbate an already dubious

balancing in favor of admission of the DTO association evidence under Rule

404(B). The trial judge admitted in ruling on the motion for directed verdict that

the State had not kept its promise of evidence showing a connection between the

DTO and the killing of Richard Valdez. Hence, the quantity of evidence going to a

non-propensity purpose for the uncharged misconduct evidence had shrunk to the

testimony of Tracy Garrison and Jude Sanchez. The testimony of these two may

100.

have been enough to escape a motion for directed verdict, but it did little to supply a link between DTO business and the killing of Valdez. The testimony of Sanchez at least included the supposed assertion of Loza that he was a hitter for the DTO – if not a business-related motive for the killing of Valdez – but as explained above in Section II, the testimony of Sanchez should not have been taken at all, because of the State's failure to establish the unavailability of Loza. Moreover, the trial judge admitted the testimony of Garrison that Mr. Chavez had beaten her at some hazy time in the past for "making a scene" without requiring the State to make the least showing of a non-propensity purpose for this grossly prejudicial information.

This was a trial based on uncharged misconduct evidence which the jury should never have heard. Because of an accumulation of judicial error, Mr. Chavez did not receive a fair trial.

## CONCLUSION AND PRAYER FOR RELIEF

For all the above-stated reasons, Appellant Joseph Chavez respectfully requests that this Court reverse his convictions for Murder and Conspiracy and remand this case to the district court for a new trial. Alternatively, the Court should find that the State failed to bring substantial evidence of either a direct or circumstantial nature to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction for Murder or Conspiracy, vacate the convictions, and remand with instructions to dismiss those charges with prejudice.

## REQUEST FOR ORAL ARGUMENT

Pursuant to NMRA 12-319, Appellant requests oral argument. Because of the number and complexity of the issues in this appeal, and because of the mandatory life sentence which hangs in the balance, Appellant submits that oral argument would be helpful to a resolution of the issues.

Respectfully submitted,

ELECTRONICALLY FILED

/s/ Jeffrey J. Buckels
Jeffrey J. Buckels, Esq.
2410 Venetian Way SW
Albuquerque NM 87106
(505) 363-4609

Attorney for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of December, 2010, I filed a true and correct copy of the foregoing electronically through the Odyssey E-File & Service System, which caused opposing counsel Martha A. Kelly to be served by electronic means at akelly@nmag.gov.

/s/ Jeffrey J. Buckels
Attorney for Appellant

102.

JOE D CHAVEZ , # 78577
LEA COUNTY CORRECTIONAL FACILITY
6900 West Millen
HOBBS, NEW MEXICO 88244

Hasler
10/14/2022
US POSTAGE $010
PRIC

ZIP
011E11



**RECEIVED**
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

OCT 1 7 2022

MITCHELL R. ELFERS
CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

OFFICE OF THE CLERK

SUITE 270

333 LOMAS BLVD., N.W.

ALBUQUERQUE, NEW MEXICO 87102

LEGAL MAIL

LEGAL MAIL